Argued February 27, affirmed June 4, petition for rehearing denied August 13, 1952.

# STATE OF OREGON *v.* PAYNE

244 P. 2d 1025

*Maurice D. Sussman,* of Portland, argued the cause and filed briefs for appellant.

*George D. Leonard,* Deputy District Attorney of Multnomah county, of Portland, and *J. Raymond Carskadon,* Deputy District Attorney, of Portland, argued the cause for respondent. With them on the brief was John B. McCourt, District Attorney, of Portland.

LATOURETTE, J.

Defendant was convicted of murder in the first degree and appeals. On the 9th day of January, 1951, defendant entered the store of H. Nathan Butler in Portland and ordered a package of cigarettes. While Butler was ringing up the sale on the cash register, defendant took a revolver from his pocket, told Butler it was a holdup and to give him the money in the till. Defendant thereupon fired his revolver five times, two of the bullets penetrating Butler's body, causing his death. One bullet entered his temple and the other entered his body between his ribs. Defendant was later apprehended and made a complete confession to the officers.

Defendant's Assignment of Error No. I follows: "The Court erred in denying defendant's motion for an order changing the date set for the trial from February 23, 1951 to March 12, 1951."

The following significant statement is found in defendant's brief:

"* * * A first degree murder, as defined by statute, was committed and a complete statement by defendant admitting all the facts was given to the authorities within five hours of the commission

of the crime * * *. A formal jury trial was not necessary under such facts to prove the defendant guilty, but *a formal jury trial was necessary because a jury and not the judge had to fix the penalty.* In effect counsel was appointed to represent the defendant in a trial the sole purpose of which was to fix the penalty. But even as to such a trial, and one might say especially as to such a trial an admitted felon, an ex-convict, who committed first degree murder, has rights and is entitled to a fair trial which term includes *the right to a suitable time under all the circumstances to prepare his case,* and that the trial be by an impartial jury for the purpose of fixing the penalty.

" * * * * *

"Defendant plead not guilty when arraigned on January 23, 1951, at which time counsel had interviewed him only once. Counsel was aware that defendant was an ex-convict with five previous felonies, that he shot the deceased victim during an attempted holdup, and therefore concededly a first degree murder had been committed."

On the 10th day of January, defendant, being charged with murder in the first degree, was bound over to the grand jury, and on January 18, a true bill was returned by the grand jury charging defendant with murder in the first degree. On January 19, upon being arraigned, defendant being without counsel, the Honorable James W. Crawford, presiding judge, appointed Maurice D. Sussman, a member of the Oregon State Bar since 1933, as attorney to represent the defendant. The cause was thereupon continued until January 23, on which date Mr. Sussman requested that Harlow F. Lenon, a member of the Oregon State Bar since 1937, be appointed additional counsel for defendant, which appointment was thereupon made by the court. The defendant, in the presence of his counsel, on that date entered a plea of not guilty, and

the case was continued for trial until a later date to be selected by the court.

On January 29, the case was assigned for trial for February 23. On February 13, defendant, through his counsel, gave notice that "* * * it will be shown in evidence that he [Payne] was insane or mentally defective at the time of the alleged commission of the murder charged in the indictment." This notice was duly recognized by the court. On this same date, Messrs. Sussman and Lenon appeared before the Honorable James W. Crawford and requested a continuance to March 12. This request was supported by Mr. Sussman's affidavit, which, as pertinent, follows:

"I, MAURICE D. SUSSMAN, of attorneys for defendant, being first duly sworn, depose and say:

"That on Friday, January 19, 1951, I was appointed by Judge Crawford, the Presiding Judge, as attorney to represent the defendant; that the first opportunity I had to talk with the defendant was on January 23, 1951, immediately prior to the time set for the defendant to plead to the indictment, and at said time defendant plead not guilty; that I and Harlow Lenon, co-councel [sic] appointed by the Court to represent the defendant, have had several interviews with the defendant since his plea was entered and we are of the opinion and belief that the defendant was insane or mentally defective at the time of the alleged commission of the act for which he is charged for murder; that by reason of the facts disclosed to us by the defendant in these interviews and statements made to us and by his conduct, acts, expression of opinions and thoughts which he has made during these interviews we are of the opinion that the defendant should be examined by a physician and also a psychiatrist. That I believe it is my duty as attorney for this defendant to have a psychiatrist determine or at least express his opinion to us with reference to defendant's mental state at the present time and

also whether or not in the opinion of the psychiatrist defendant was insane or mentally defective.

"That additional time is necessary to properly prepare the defense on behalf of the defendant, to select such psychiatrist and physician and to have such examinations made.

"That at the time I was appointed attorney for defendant there were several matters pertaining to my private practice which have to be disposed of including several court matters during the week commencing February 12th and during the week commencing February 19th; that my regular business has prevented me from devoting sufficient time to the preparation of this case if the trial were to commence on February 23, 1951; that since being appointed I have spent considerable time in familiarizing myself with various phases of this case and matters pertaining to criminal law and its procedure and I honestly and sincerely feel that I will not be properly prepared to defend this defendant if the trial were to commence February 23, 1951; that I am not making this request for the purpose of delaying this trial but I am requesting a postponement of approximately two weeks so that I may properly prepare the defense as I feel it is my bounden duty to do.

"/s/  MAURICE D. SUSSMAN"

Pursuant to the application of counsel, the court appointed Dr. Vivian B. Kenyon, a psychiatrist, Dr. Earl Smith, a physician, and Harvey Gratiot, a ballistic expert.

The trial, which started on February 23, was concluded on March 6. By a verdict of the jury, the defendant was found guilty of first degree murder without recommendation, whereupon he was sentenced to death.

Section 26-905, OCLA, provides that:

"* * * When an indictment is at issue upon a question of fact, and before the same is called

for trial, the court may, upon sufficient cause shown by the affidavit of the defendant, or the statement of the district attorney, direct the trial to be postponed to another day in the same term, or to another term; and all affidavits or papers read on either side upon the application must be first filed with the clerk.''

The basis for the application for a continuance was the affidavit of Mr. Sussman, the attorney, and not that of the defendant, as required by the above statute. See 1 Am Jur, Affidavits, 935, § 4; 2 CJ, Affidavits, 321, § 19; 2 CJS, Affidavits, 927, § 6. However, it will be unnecessary to pass on the legal aspect of the defendant's failure to personally make an affidavit since, in our opinion, the affidavit of Mr. Sussman is not such as would require a reversal of the case on the ground that the trial court abused its discretion in failing to grant a postponement.

■ It is a well-recognized rule that, in passing on an application for a postponement of a trial, the court's decision in denying the application will not be disturbed ''unless the decision is manifestly wrong and arbitrary, involving an abuse of sound discretion * * *.'' *State v. O'Neil,* 13 Or 183, 185. See *State v. Leland,* 190 Or 598, 227 P2d 785; *Avery v. Alabama,* 308 US 444, 84 L ed 377, 60 S Ct 321.

Much of Mr. Sussman's affidavit consists of conclusions, rather than statements of fact, which, under the authority of *Portland & O.C. Ry. Co. v. Sanders,* 86 Or 62, 69, 167 P 564, were, in themselves, insufficient to warrant a continuance.

The important matter which the court had before it on the application for a continuance, as evidenced by Mr. Sussman's affidavit, in addition to the appointment of a physician and a psychiatrist, was that he

was so engrossed with his private practice that he did not have time to properly defend the defendant. When Mr. Sussman accepted the appointment by the court on January 19 to act as attorney for the defendant, in a matter of such importance it was his bounden duty as an attorney to sidetrack his private business sufficiently to properly look after the interests of the defendant; otherwise, he should have moved the court that he be relieved of the appointment as counsel for the defendant. Instead of doing this, however, he applied to the court to have Mr. Lenon associated with him in the case, which application was allowed. There is no showing that Mr. Lenon was so engaged in private practice that he could not tend to the defendant's business, nor is there any showing at all that Mr. Lenon could not, or did not, fully represent defendant in the case.

We do not believe that the defendant was prejudiced by the refusal to grant a continuance. At the time the application for continuance was made, Mr. Sussman was complaining that he had pending matters pertaining to his private practice which would not enable him to properly prepare defendant's defense. That Mr. Sussman overcame such alleged handicap is evidenced by the following, which occurred at the beginning of the trial:

"THE COURT: I assume you are ready to proceed, Gentlemen.

"MR. COLLIER: The State is ready, your Honor.

"MR. SUSSMAN: The defendant is ready, your Honor.

"THE COURT: You may call a jury, Mr. Clerk."

It is urged that the presiding judge's reasons for refusing a continuance evidenced an abuse of discretion. We find no order on said motion in the record; however, in the transcript, we find the following statement of the Honorable James W. Crawford:

> "February 13, 1951, Mr. Sussman moved the trial date be continued for some ten days following February 23, 1951. He stated to me he had private business that required his attention and that it would be very difficult for him to prepare for trial. Being of the opinion that having been appointed January 19th, ample time had been afforded him for preparation and that the grounds stated did not justify a continuance, I denied the motion.

> "He then mentioned something about securing the services of psychiatrists to examine the defendant. In this respect also I felt that ample time had been afforded and that such services as he needed could be secured during the ten-day period yet to intervene prior to the trial date. I also stated that this trial date of February 23rd had been set in contemplation of the fact that an experienced jury would be available for the trial of the case, to-wit, the February jury that had served during the entire month of February, and that experienced jurors could more advantageously dispose of a case of this importance than a new jury which would be entirely inexperienced should the continuance be granted to the first week in March."

From the foregoing, it is obvious that the court, in denying the continuance, based his denial on the absence of grounds contained in the affidavit to justify a continuance. The reference to the "experienced" jury could just as well have been eliminated, but there is no contention made that the trial jury selected was not impartial or was unfair. Counsel is in no position to urge the unfairness of the trial jury because it was an "experienced" jury since, from the following state-

ment found in defendant's brief, he would have had an experienced jury, had his motion for a continuance to the date suggested been allowed. We quote:

"Furthermore, counsel in requesting to the 12th of March, and then orally to the 5th of March did not do so for the purpose of avoiding an 'experienced' jury which would have been equally available March 18th or 23rd."

From the following statement in defendant's brief, it is clear that counsel requested a continuance for the purpose of preparing defendant's defense not as against the charge of first degree murder but with reference to the penalty only:

"The act of the Honorable Presiding Judge was error and it was prejudicial error. It deprived defendant of his right to have not merely counsel, but counsel prepared; prepared not to defend the act of first degree murder, but fully prepared with reference to the penalty to be imposed."

■ We are of the opinion that 30 days gave counsel sufficient time in which to prepare the defense suggested, and that this assignment of error is without merit.

Assignment of Error No. II is that, "The trial court erred in excusing for implied bias jurors who expressed themselves as having opinions or objections to the death penalty."

Section 26-917(6), OCLA, enacted in 1864, providing for a challenge for implied bias where a prospective juror has conscientious scruples against capital punishment, still remains on the statute books. In the recent case of *State v. Leland,* supra, we held that this section was still in force and effect and was not in conflict with the constitutional provision of § 37, Article I of the constitution, which revived the death

penalty in first degree murder cases, even though such constitutional provision gives the jury the power to recommend life imprisonment. It is asserted, however, that § 26-917(6) was expressly repealed (and never re-enacted) by § 36, Article I of the constitution, adopted in 1914, by the following:

"Section 36. The death penalty shall not be inflicted upon any person under the laws of Oregon. The, maximum punishment which may be inflicted shall be life imprisonment.

"All provisions of the Constitution and laws of Oregon in conflict with this section are hereby abrogated and repealed in so far as they conflict herewith, and this section is self executing."

■ Assuming, without deciding, that § 26-917(6) was expressly repealed by § 36, Article I of the constitution, such section was expressly revived by § 38, Article I of the constitution adopted in 1920, as follows:

"* * * All provisions of the laws of Oregon abrogated and repealed as in conflict with section 36, which section is hereby repealed, are hereby revived as of full force and effect from and after the adoption of this constitutional amendment, subject to amendment by the legislative assembly. [Amendment adopted at referendum election held May 21, 1920; effective June 18, 1920. L. 1921, p. 6]"

In *State v. Hecker,* 109 Or 520, 549, 221 P 808, this court, speaking through Mr. Justice Harris who went into this question thoroughly and extensively, held: "It is obvious that one of the objects to be accomplished by the amendment of 1920 was the revival of whatever laws had been repealed by the amendment of 1914;". (Section 38, Article I of the constitution).

It is next argued that:

"* * * Section 38 of Article I of the Constitu-

tion was inadequate to revive subparagraph 6 of the statute on implied bias, because no mention was made of the title or the subject matter of the statute. See also Senate Joint Resolution No. 8 L. Sp. (1920) Sess. p. 102. In this respect it violates the provisions of Article IV, Section 22 of the Oregon Constitution which provides: 'No act shall ever be revised or amended by mere reference to its title, but the act revised or section amended shall be set forth and published at full length.''

■ The above article obviously refers to the acts of the legislature in enacting laws and has no reference to an amendment to the constitution.

It is next argued that the constitutional amendment of 1920, restoring the death penalty, comprising §§ 37 and 38 of said Article I of the constitution, was unconstitutional because it did not comply with § 1, Article XVII of the constitution, which, as pertinent, follows:

''* * * When two or more amendments shall be submitted in the manner aforesaid to the voters of this state, at the same election, they shall be so submitted that each amendment shall be voted on separately.''

■ The constitutional amendment of 1920 did not contravene § 1 of Article XVII of the constitution because only one amendment was submitted to the voters, and that amendment was to amend the 1914 constitutional provision abolishing the death penalty. The 1914 amendment outlawing the death penalty contained, in effect, two sections, although not separately numbered, the latter repealing all provisions of the constitution and laws in conflict with the first section so that if counsel's argument is tenable, the 1914 constitutional amendment abolishing capital punishment would have been unconstitutional, and the death penalty would not legally have been abolished. See Ex Parte

Kerby, 103 Or 612, 205 P 279; *State v. Osbourne,* 153 Or 484, 57 P2d 1083.

Following is Assignment of Error No. III: "The court erred in denying defendant's motion for new trial." Defendant bases this assignment on the ground of newly discovered evidence. A new trial may be granted under subd. 4 of § 5-802, OCLA, on the following ground: "Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial;".

■ In *State v. Edison,* 191 Or 588, 595, 232 P2d 73, we laid down the requirements necessary to be met before a new trial will be granted on the grounds of newly discovered evidence. These are:

"* * * (1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as, with due diligence, could not have been discovered before the trial; (4) it must be material to the issue; (5) it must not be merely cumulative; (6) it must not be merely impeaching or contradicting of former evidence."

In support of the motion for a new trial on the grounds of newly discovered evidence the affidavit of Ruth L. Payne, defendant's wife, was submitted. Such affidavit related to the time she and her husband first met; that he worked for the Addressograph Company; that he joined the Trinity Lutheran Church of which she was a member. She told of their marriage date, their happy home life; that defendant was "considerate and affectionate" and "kind". That in May, 1950, he left for Portland without telling her because he had gambled away all his money; that he returned home but left again in July, 1950, also without notify-

ing her; that he was unable to get his job back; that he became "more nervous and restless," that he was "quiet" and "shy," and was unable to "sleep well", that "he seemed worried" and "smoked incessantly"; that he went to a doctor who diagnosed his trouble as a liver inflammation. That the night before he left permanently he gave no indication of his intentions and took her to work the next morning, and at noon he was gone, leaving a note for her; that she could not have been present for the trial because of shock.

Henry C. Lemmon, defendant's former employer in El Paso, Texas, gave a supporting affidavit, the gist of which follows: that he first knew defendant in November, 1946, and that he was highly recommended by his former employer; that defendant was "a very energetic, dependable and conscientious worker" and had "a lot of initiative"; that Payne had "an unusual capacity for loyalty, sincerity and honesty."; that when Mr. Lemmon was out of town, Payne had authority to sign checks. That he left Mr. Lemmon's employment in February, 1949, but that in June, 1949, at Mr. Lemmon's request he returned to help train help, and remained until August, 1949; that he first knew of defendant's trouble in March, 1951, when he was contacted by Mr. Sussman; that he would have appeared at the trial had he known; that he feels true facts were not presented to the jury; and that he had noticed no previous "criminal tendencies"; that his act was "utterly unexplainable and inconsistent", and that "he must have been insane."

The Rev. Phillip Ellman, pastor of Augustana Lutheran Church in Portland, also gave an affidavit, but, since he was a witness at the trial, anything he said in the affidavit would be of no assistance in determining the matter before us.

Attorney Sussman also filed an affidavit, the contents of which are mostly based on hearsay and the remainder of which would be immaterial to the question now being considered.

All the defendant's wife and former employer said in their affidavits was known to defendant prior to trial, and, therefore, this information would not be considered newly discovered evidence.

Defendant took the witness stand and gave his life's history, including those material matters referred to by his wife and Mr. Lemmon in their affidavits. Such evidence would, therefore, be cumulative.

We doubt the materiality of such statements as adduced from the affidavits. Defendant's plea was not guilty by reason of insanity, and there is not one bit of evidence contained in these affidavits which would, in any wise, indicate defendant's insanity. It is argued, however, that, since such evidence would show defendant sane at the times therein mentioned, the jury could infer from the enormity of his later acts that he must have been insane at the time of the commission of the crime. We do not believe such argument is tenable or sound, and, in any event, it would not be the basis for a new trial on newly discovered evidence.

It is urged that, since defendant was insane, this would excuse him from divulging to his counsel the facts that were stated in the affidavits of his wife and Mr. Lemmon. As hereinbefore stated, defendant took the witness stand, and his testimony occupies 124 pages in the transcript. It is obvious, from reading defendant's testimony, that he was able to convey his thoughts clearly and cogently, and his testimony leaves the impression that he was a man of ordinary intelligence rather than one of low mentality. In fact, his

own witness, Dr. Vivian Kenyon, a psychiatrist, testified that, although he was a paranoid schizophreniac, these types "usually are of pretty high intelligence, one of the highest types of intelligence." It is our opinion that defendant was rational to such a degree that he could enlighten his attorney concerning his past life. He thoroughly covered his whole life's history in his testimony to the jury. A party will not be permitted to withhold evidence, speculate on the outcome of the trial, and, if it turns adversely to him, later seek to employ the withheld evidence. *State of Oregon v. Edison,* supra, at p. 596.

In any event, during the course of the trial, it is adduced from defendant's testimony that he had worked for Mr. Lemmon for over two years, and that he was married, in both instances giving the addresses of the parties. The record further shows that counsel obtained knowledge of the foregoing from the Rev. Phillip Ellman on February 23, the date of the beginning of the trial, and that defendant did not want his wife notified of his predicament. With this knowledge, counsel should have sought to obtain the testimony of these people, and, if such was not available at that time, he should have asked for a continuance, all of which he failed to do.

Since we find no error in the record, the judgment will be affirmed.