No. 33        September 11, 2015        665

IN THE SUPREME COURT OF THE
STATE OF OREGON

GREENWOOD PRODUCTS, INC.,
an Oregon Corporation;
and Jewett-Cameron Lumber Corp.,
an Oregon corporation,
*Petitioners on Review,*

*v.*

GREENWOOD FOREST PRODUCTS, INC.,
an Oregon corporation;
Jim Dovenberg, an individual;
and Bill Lefors, an individual,
*Respondents on Review.*

(CC 050302553; CA A135701; SC S062497)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 16, 2015.

Kevin H. Kono, Davis Wright Tremaine LLP, Portland, argued the cause and filed the briefs for petitioners on review. With him on the briefs were Timothy Cunningham and Robert D. Newell.

Maureen Leonard, Portland, argued the cause for respondents on review. Travis Eiva filed the brief. With him on the brief was Maureen Leonard.

BREWER, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings. The order of the circuit court denying defendants' motion for a new trial is affirmed.

_____
* Appeal from Multnomah County Circuit Court, Jerry B. Hodson, Judge. 264 Or App 1, 330 P3d 662 (2014).

**BREWER, J.**

The issue on review in this case is whether the trial court erred in denying defendants'[1] motion for a new trial under ORCP 64 (B)(4),[2] based on the asserted ground of newly discovered evidence. The trial court determined that defendants' proffered evidence did not satisfy the legal standard for granting a new trial under that rule. The Court of Appeals reversed, concluding that defendants' post-trial proffer qualified as newly discovered evidence, that the evidence was material for defendants, and that defendants exercised reasonable diligence in attempting to produce the evidence at trial. *Greenwood Products v. Greenwood Forest Products*, 264 Or App 1, 330 P3d 662 (2014) (*Greenwood III*).[3] Because we conclude that, irrespective of whether the proffered evidence was newly discovered and material for defendants, defendants failed to exercise reasonable diligence to produce the evidence at trial, we ultimately conclude that the trial court did not err in denying defendants' motion for a new trial. Accordingly, we affirm the trial court's order denying a new trial, reverse the decision of the Court of Appeals, and remand the case to that court.

## I.   FACTS AND PROCEDURAL BACKGROUND

This case has a complex procedural history that the Court of Appeals thoroughly described in its opinion. For the sake of brevity and clarity, we take a condensed version of that history from the opinion of the Court of Appeals and the record. Defendants were in the business of processing

---

[1] Defendants are Greenwood Forest Products, Inc. and two of its principals, Dovenberg and LeFors. For the sake of convenience, we refer to them collectively throughout this opinion.

[2] ORCP 64 provides, in part:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial."

[3] As explained below, the Court of Appeals' decision under review is the third published appellate decision in this case; hence, its designation as *Greenwood III*.

and selling industrial wood products and maintained a large inventory of such products at numerous distribution centers throughout the United States. *Id.* at 3. In February 2002, defendants and plaintiffs entered into an asset purchase agreement (PA), which provided that (1) by the closing date, defendants would dismiss most of their employees who would then be rehired by plaintiff; (2) over a two-year period, plaintiffs would purchase defendants' inventory in seven geographically determined units for cost plus a two percent premium; and (3) until plaintiffs' purchase of an inventory unit, plaintiffs, for a fee, would provide defendants with, in the words of the PA, "all management and administrative services associated with purchasing, processing, and maintaining [defendants'] inventory." *Id.* at 3-4.

Pursuant to the PA, plaintiffs took over defendants' offices and equipment. Most of defendants' employees and managers became plaintiffs' employees, holding the same positions that they had held with defendants. Defendants continued to exist side-by-side with plaintiffs—with defendants being responsible, at least on paper, for maintaining the inventory that plaintiffs' employees sold. For the inventory units that had not yet been purchased by plaintiffs, plaintiffs' employees sold wood products to outside customers, purchasing inventory to cover each sale from defendants at cost plus two percent. The purchases and sales were tracked automatically on two sets of books—one for each company. Although defendants were responsible, during the transition, for replenishing, processing, and maintaining the supply of inventory that plaintiffs' employees sold, plaintiffs' employees actually performed all of that work, under the "management and administrative services" provision of the PA. *Id.* at 4.

After the closing in late February 2002, defendants retained only two employees—Dovenberg and LeFors; defendants' remaining central staff went to work for plaintiffs. Various key employees, including Fahey, the head bookkeeper, and Pattillo, the vice president, while working for plaintiffs, spent part of their time attending to defendants' accounts and overseeing that company's operations. In practice, it was difficult to say which "hat" a given employee was wearing at any particular time. *Id.* at 4-5.

Units of inventory were purchased and sold as the parties had envisioned for some 13 months after closing, at which point the parties agreed to "finish it off" in a single transaction. Plaintiffs issued two promissory notes, dated March 18, 2003, for the remaining inventory. In June 2003, plaintiffs issued another promissory note and paid about $100,000 in cash for "an accumulation of payable for prior purchases of inventory that were due for payment." The amounts of the notes and cash payment were based on inventory figures provided by traders' assistants and other higher level "accounting people," including Fahey and Pattillo. At the time of the final payments and transfers, the transaction set out in the PA appeared to be essentially completed. *Id.* at 5.

In August 2003, plaintiffs' books were audited by a certified public accountant, Schmidt. Schmidt found unusual entries in the books—an unexplained account with a balance of nearly $1.2 million and many entries that did not appear to be related to normal inventory activity. Schmidt suspected that there was a problem with the accounting of sales of inventory between plaintiffs and defendants. On the theory that any inventory transactions by plaintiffs also should be reflected in defendants' accounting records, Schmidt asked for, and obtained, permission to review those records. While comparing defendants' records with plaintiffs' records, Schmidt found hundreds of entries that did not match. Schmidt eventually decided that, to accurately determine what had happened with the inventory, he would have to reconstruct both plaintiffs' and defendants' books from scratch, using "invoices and purchase orders and all the underlying documentation that would happen on a day-to-day basis in a business." When Schmidt completed that work, the figures led him to the conclusion that plaintiffs had paid defendants for $819,731.68 of inventory that they never had received. *Id.* at 5-6.

After Schmidt completed his work on defendants' books, Dovenberg approached him about some inconsistencies in Dovenberg's own personal accounts. Schmidt attempted to help Dovenberg sort out the problem. Ultimately, the two determined that Fahey, the bookkeeper who was employed by plaintiffs but was providing inventory-related services

to defendants, had embezzled at least $360,000 from defendants' accounts between February and December of 2002. *Id.* at 6.

Three legal actions—including this case—ensued. First, in 2004, defendants brought a conversion action against Fahey. Second, in March 2005, plaintiffs brought this action against defendants asserting breach of contract and equitable claims for reformation or rescission of the promissory notes, and defendants asserted counterclaims, including a claim based on plaintiffs' failure to pay the entire face value of the promissory notes to defendants. Third, in April 2005, after being contacted by defendants, the district attorney brought criminal charges for theft against Fahey. *Id.*

In January 2006, Fahey pleaded guilty to 10 counts of theft. Fahey's sentencing initially was scheduled for May 2, 2006, approximately one week before trial was set to begin in this case. In resolving his criminal case, Fahey agreed to cooperate with defendants' efforts to locate missing assets, including its efforts in this action. On May 1, Fahey's sentencing hearing was postponed, in Dovenberg's words, so that "[Fahey] could help in trying to find out what happened to" the missing assets. Thereafter, plaintiffs' attorney learned about the postponement of Fahey's sentencing and that defendants had subpoenaed Fahey to testify at trial in this case. On Friday, May 5, plaintiffs' attorney had a subpoena served on Fahey for a deposition that was scheduled to begin the next morning. Although plaintiffs' attorney served defendants' attorney with notice of the deposition, he did not notify Fahey's criminal defense attorney that he had subpoenaed Fahey. As a result, lawyers for the parties in this action were present the following morning, but Fahey's attorney was not. *Id.* at 6-7.

At the beginning of his deposition, Fahey made the following statement:

"For the record, I was served yesterday evening at 6:35 p.m. I have not had a chance to contact my counsel. As there is a pending criminal case on this in Washington County, [on] anything alluding to any of those areas I will be taking the Fifth Amendment."

*Id.* at 7. During the deposition, plaintiffs' attorney asked Fahey questions about his work for defendants, as well as questions about the criminal action, including questions about the amount of money that Fahey had taken—an issue that was central both to this action and also to the criminal charges against Fahey. In response to many questions, Fahey asserted his Fifth Amendment privilege. In addition, he did not respond to some questions because he thought that a protective order precluded him from answering. *Id.* at 8.

Nevertheless, Fahey answered many of plaintiffs' questions. In doing so, Fahey indicated that plaintiffs may not, in fact, have paid for more inventory than they had actually received. That was so based on Fahey's theory concerning the activities of Pattillo, plaintiffs' vice president and Fahey's supervisor, in manipulating inventory amounts reflected in defendants' computer system. According to Fahey, Pattillo "may have phantomly * * * purchased" inventory, placed it on defendants' books, and "then [had it] taken off the books prior to those locations being sold to [plaintiffs]." *Id.* Fahey testified that Pattillo had instructed him to remove inventory from defendants' books on several occasions and that he "always requested a note or something signed or initialed" from Pattillo before doing so. According to Fahey, he placed the documentation from Pattillo in a file with other miscellaneous documents at the end of each month. *Id.*

Plaintiffs' attorney also asked Fahey about his prior discussions with defendants' attorneys in this case and in the conversion action. With respect to this action, Fahey indicated that he did not recall talking about Pattillo but explained that his "attorney * * * was present at the time and our subject was incredibly limited [as] to what we would talk about." With regard to his discussions with defendants' attorneys in the conversion action, Fahey said that he had not "really told [those attorneys] anything yet." Instead, Fahey explained:

> "I suggested that they get copies of cancelled checks. I suggested that they go to certain vendors and locations and get copies of any inventory records they might have. I mentioned

that before[,] at the meeting in February [2006]. But up to this point in time[,] I can't give any specific information to them regarding anything."

*Id.* at 8-9.

On May 8, 2006, two days after plaintiffs took Fahey's deposition, trial in this case began. Before Fahey was scheduled to testify, Fahey's criminal defense counsel appeared on his behalf and filed a motion to seal the deposition transcript. Nothing in the record before us suggests that defendants objected to that motion. The hearing that followed was not transcribed for this proceeding. Ultimately, the trial court granted Fahey's motion and sealed the deposition transcript; however, the court did not preclude Fahey from testifying at trial. *Id.* at 9.

Thereafter, defendants called Fahey as a witness outside the presence of the jury, and defendants' attorney asked the following question: "Was there a time within [February 25, 2002 until December 31, 2002,] when you were instructed to remove inventory off the books of [defendants]?" *Id.* At that point, Fahey's counsel interjected, "Judge, I'd advise my client to invoke the Fifth Amendment on that question." *Id.* In the ensuing colloquy, defendants' position was that the Fifth Amendment privilege was unavailable to Fahey because the statute of limitations had run as to the conduct referred to in the question. *Id.* Fahey's counsel disagreed that the privilege was unavailable, particularly in that Fahey had not yet been sentenced for the crimes to which he had pleaded guilty. *Id.* Ultimately, the trial court indicated, "I'm not going to make any findings with regard to statutes of limitation[.]" *Id.* at 10. Defendants' counsel sought clarification, after which the following exchange occurred:

"THE COURT:   So [Fahey's counsel is] going to advise his client to invoke the Fifth in areas where he's uncomfortable because he doesn't know whether or not the statute has run.

"[DEFENDANT'S COUNSEL]:   And I'm going to invite you to tell [Fahey] they don't have a Fifth Amendment right to do that.

"THE COURT:  And I'm not going to do that. If he invokes his Fifth Amendment, then he's going to invoke his Fifth Amendment, and he won't testify in that area.

"[DEFENDANT'S COUNSEL]:  Okay. * * *

"THE COURT:  So do you want to proceed with that witness or not?

"[DEFENDANT'S COUNSEL]:  No, I am not proceeding with that witness."

*Id*. Accordingly, Fahey did not testify before the jury.

Plaintiffs, however, called Pattillo as a witness during their rebuttal case. Pattillo testified that, in light of the "checks and balances" that were in place in defendants' accounting system, it would have been "virtually impossible" for inventory to come in and then be removed from the books. On cross-examination, Pattillo testified that he had been unaware of Fahey's embezzlement. Pattillo further testified that (1) he was responsible for reconciling the inventory as reflected in the computer system with the inventory reflected in the traders' spreadsheets on a monthly basis; (2) he occasionally instructed Fahey to make adjustments to inventory; and (3) he usually gave Fahey information concerning where the adjustment needed to be made, which "probably had [his] initial on it." *Id*.

As framed by the parties, the jury's determination of the breach of contract claim reduced to the question whether plaintiffs had paid for inventory that they did not receive from defendants. Plaintiffs asserted that Schmidt's reconstruction of both companies' books revealed that plaintiffs had paid defendants for $819,731.68 in inventory that they had not received and that the overpayment resulted from Fahey's manipulation of the books to hide his embezzlement from defendants. According to plaintiffs, although Fahey was plaintiffs' employee, Fahey's actions were attributable to defendants because they had the right to control his actions. For their part, defendants posited that plaintiffs' overpayment, if any, was caused by the misconduct of plaintiffs' own employees—Fahey and Pattillo—who had performed accounting services for defendants under the management and administrative services provision of the

PA and whose misconduct could not be attributed to defendants. *Id.* at 11.

On May 15, 2006, the jury returned a verdict for plaintiffs on the breach of contract claim, which included damages in the amount of $819,731.68 for the overpayment of inventory. The jury also found in favor of defendants on their counterclaim for nonpayment on the promissory notes in the amount of $1,043,757.00. *Id.*

Sixteen days later, on May 31, 2006, Fahey was sentenced in the criminal action. At his sentencing, Fahey executed an affidavit that was witnessed by the sentencing judge, which defendants then submitted in support of their motion for a new trial in this case. In that affidavit, Fahey described in detail Pattillo's conduct in instructing Fahey to remove phantom inventory from defendants' books before it was sold to plaintiffs. That information supported defendants' position that plaintiffs had not, in fact, overpaid for inventory; that is, plaintiffs received exactly what they had paid for. *Id.* at 11-12.

In sum, Fahey's affidavit asserted the following: After the closing date of the PA in February 2002, Pattillo directed Fahey to manipulate inventory in defendants' computer system in a way that "was not in accordance with regulations governing accounting practices and procedures" and gave Fahey documents "sign[ing] off" on those inventory manipulations. Because plaintiffs were subject to public accounting and auditing requirements, a physical count was required before a unit of inventory was sold to plaintiffs. When the physical count was less than the inventory reflected in the computer system, Pattillo instructed Fahey to remove the excess inventory from the inventory record as it existed on the computer system. Moreover, based on Fahey's review of the system itself, he described the specific search queries that could be used to isolate entries resulting in the removal of inventory, and he substantiated that defendants had issued checks to suppliers for the inventory that had been removed. Defendants used a different computer database to track what occurred after the issuance of the checks, and Pattillo—not Fahey—had the ability to make entries in that database. *Id.* at 12-14.

After Fahey executed his affidavit—but before defendants filed their motion for new trial—the trial court decided plaintiffs' equitable claims for rescission and reformation of the notes in defendants' favor and entered a judgment awarding damages according to the jury's verdicts. The court, by order, also unsealed Fahey's deposition transcript. *Id.* at 15.

Defendants then filed a motion for a new trial under ORCP 64 B, raising a variety of grounds. As pertinent here, defendants sought a new trial under ORCP 64 B(4), relying primarily on Fahey's affidavit as newly discovered evidence that warranted a new trial under the rule. Specifically, defendants contended that "most of the information" in Fahey's affidavit "was neither discussed nor disclosed in his deposition." In particular, unlike Fahey's deposition testimony, his affidavit "specifically identif[ied], on a step-by-step basis, exactly how manipulation of the inventory occurred" at Pattillo's instruction. Defendants explained that, although "it was generally known" to their counsel that Pattillo had knowledge of Fahey's embezzlement, "the exact method of how this was accomplished, and the resulting manipulation of the inventory, was neither known nor capable of discovery." According to defendants, the jury's consideration of Fahey's affidavit "would have significant effect." *Id.*

During the hearing on defendants' motion, the trial court indicated that, to obtain a new trial, defendants had "a pretty heavy standard burden that [they] need[ed] to meet" and that defendants "[had not] met that burden." Nevertheless, the trial court did not enter a timely order denying defendants' motion for a new trial, and, as a result, the motion was deemed denied pursuant to ORCP 64 F(1). *Id.* at 15-16.[4]

Thereafter, the trial court entered a supplemental judgment awarding plaintiffs their attorney fees on the breach of contract claim and awarding defendants their

---

[4] The Court of Appeals reviewed the trial court's denial of a new trial for errors of law, in part, because it concluded that defendants' motion was deemed denied by operation of law. *Id.* at 20. Plaintiffs challenge that conclusion on review. In light of our determination that the applicable standard of review is for errors of law in any event, *see* 357 Or at 679-80, we need not address that issue.

attorney fees on the counterclaim for nonpayment of the promissory notes. However, the court denied defendants their claimed expert expenses. *Id.* at 16.

Defendants appealed the general judgment and the supplemental judgment for attorney fees, raising seven assignments of error, and plaintiffs cross-appealed. *Id.* On appeal, the Court of Appeals concluded that defendants were entitled to a directed verdict on plaintiffs' breach of contract claim. *Greenwood Products v. Greenwood Forest Products*, 238 Or App 468, 480-82, 242 P3d 723 (2010) (*Greenwood I*). That disposition obviated the need to consider defendants' third through sixth assignments of error. *Id.* at 482. However, the Court of Appeals addressed defendants' seventh and final assignment of error pertaining to the trial court's supplemental judgment. *Id.* at 482-85. Because it had reversed the judgment on the breach of contract claim, the Court of Appeals reversed the trial court's award of attorney fees to plaintiffs on that claim and remanded for a determination of defendants' entitlement to fees. *Id.* at 482-83. The Court of Appeals also concluded that defendants—who had prevailed on their counterclaim for nonpayment of the promissory notes—were entitled to recover expert expenses and remanded for the trial court to award reasonable expert expenses to defendants. *Id.* at 483-85. Finally, the court rejected as unpreserved plaintiffs' sole contention on cross-appeal concerning the trial court's denial of plaintiffs' claim for rescission as to the promissory note issued in June 2003. *Id.* at 485-86.

On review, this court held that "the trial court in this case properly rejected each of the grounds that defendant[s] raised at trial for granting their motion for a directed verdict on plaintiffs' breach of contract claim." *Greenwood Products v. Greenwood Forest Products*, 351 Or 604, 620, 273 P3d 116 (2012) (*Greenwood II*). As a result, we reversed the Court of Appeals' decision and remanded to that court to consider several assignments of error that had been obviated by that court's disposition in *Greenwood I* or that it needed to readdress because its decision had been predicated on defendants' entitlement to a directed verdict. *Id.* at 620-21.

On remand, the Court of Appeals held that defendants were entitled to a new trial on plaintiffs' breach of contract claim. *Greenwood III*, 264 Or App at 20. The court gave three reasons for its decision. First, even though defendants' motion relied, in part, on Fahey's deposition testimony, the primary basis of the motion was Fahey's post-trial affidavit, which, according to the Court of Appeals, "presented qualitatively different information than did the deposition transcript." *Id.*

Second, the Court of Appeals concluded that defendants could not with reasonable diligence have discovered and produced the evidence contained in Fahey's affidavit at trial. *Id.* The court noted that, before trial, defendants' attorney had "had the occasion to have conversations with [Fahey] in the presence of his criminal attorney" and that "[s]ubstantial limitations were placed upon the questions [he] was able to ask [Fahey] by his criminal attorney, as a result of the then pending criminal charges." *Id.* at 21. Further, the court noted, at the time of trial, "a significant amount of information" in Fahey's affidavit "was not know[n] to [defendants' attorney]," and he did not believe that he "would have been permitted to inquire into the subject matter during [his] various conversations with [Fahey], because [of Fahey's] pending criminal prosecution." *Id.*

The Court of Appeals observed that, but for plaintiffs' improper procurement of Fahey's deposition, defendants would not have discovered information about Fahey's thesis concerning Pattillo's purported inventory manipulation.[5] *Id.* Further, the court stated, Fahey's successful efforts at the time of trial in this case to seal Fahey's deposition testimony, which alerted defendants to Fahey's thesis concerning Pattillo's inventory manipulation scheme—demonstrated that Fahey's counsel would not have permitted defendants to inquire into this subject matter either before or during trial. *Id.* Indeed, the court observed, when defendants called Fahey as a witness outside the presence of

---

[5] As the Court of Appeals noted, this court issued a decision reprimanding plaintiffs' attorney for communicating with Fahey, whom he knew was represented by a lawyer, regarding that subject of representation. *In re Newell*, 348 Or 396, 234 P3d 967 (2010).

the jury and attempted to inquire about Pattillo's purported inventory manipulation, Fahey's attorney advised Fahey to assert his Fifth Amendment privilege—and, notwithstanding defendants' protests, the trial court effectively precluded defendants from eliciting testimony from Fahey about that manipulation. *Id.* In sum, the court concluded:

> "[U]nder the totality of the circumstances in this case, defendants, in the exercise of reasonable diligence, could not have discovered and presented Fahey's putative testimony, which, as set out in his post-trial affidavit, coherently and precisely detailed and substantiated how Pattillo's manipulation occurred in a way that did not result in [plaintiffs'] overpaying for the inventory that [they] received from [defendants]."

*Id.* at 21-22.

Third, the Court of Appeals concluded that, if believed, Fahey's affidavit demonstrated that plaintiffs had not overpaid defendants for inventory or at least substantially controverted plaintiffs' evidence to the contrary. *Id.* at 22. That evidence, the court opined, if believed, "would probably lead a reasonable person to a different decision from that reached by the jury." *Id.*

In sum, the Court of Appeals agreed with defendants that, as required by ORCP 64 (B)(4), the evidence in Fahey's affidavit was newly discovered evidence, material for defendants, which they could not with reasonable diligence have discovered and produced at trial. *Id.* at 24. Accordingly, the court concluded that defendants are entitled to a new trial on plaintiffs' breach of contract claim, and it reversed and remanded on that basis.[6] *Id.* at 24-25. On review, plaintiffs challenge all three grounds on which the Court of Appeals relied in reaching its decision.

## II.    ANALYSIS

### A.    *Standard of Review*

Our standard of review of a trial court's denial of a motion for a new trial depends on the nature of the alleged

---

[6] In light of its conclusion that defendants are entitled to a new trial on the breach of contract claim, the Court of Appeals reversed the attorney fee award to plaintiffs on that claim. *Id.* at 24.

error. This court sometimes has stated that it reviews a trial court ruling on a motion for new trial for abuse of discretion. *See, e.g.*, *Oberg v. Honda Motor Co.*, 316 Or 263, 272, 851 P2d 1084 (1993), *rev'd on other grounds*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994). That standard is used, for example, in reviewing a trial court's determination of whether an irregularity was sufficiently prejudicial to warrant a new trial based on juror misconduct "because the trial judge is usually in a better position to evaluate the circumstances of each case and the prejudicial effect, if any, of any claimed irregularity." *Moore v. Adams*, 273 Or 576, 579, 542 P2d 490 (1975). However, "[w]hen the trial court's order of a new trial is based on an interpretation of the law, we review that order for errors of law." *Bennett v. Farmers Ins. Co.*, 332 Or 138, 151, 26 P3d 785 (2001).[7] *See also* *State v. Sundberg*, 349 Or 608, 624, 247 P3d 1213 (2011) (same).

As noted, the trial court in this case concluded that defendants' purported newly discovered evidence did not authorize a new trial under the applicable legal standard. The Court of Appeals concluded that, in making that determination, the trial court did not correctly apply that legal standard. Accordingly, we review the conclusions of the trial court and the Court of Appeals for legal error. *Cf. State v. Arnold*, 320 Or 111, 122, 879 P2d 1272 (1994) (holding that post-trial discovery of asserted newly discovered evidence did "not satisfy the requirement that the evidence must be such as, with reasonable diligence, could not have been discovered and produced at trial").

B. *Newly Discovered Evidence*

The threshold issue that the parties present is whether the information in Fahey's affidavit qualified as newly discovered evidence under ORCP 64 (B)(4). According to defendants, Fahey's testimony was newly discovered within the meaning of the rule because, as a consequence of his invocation of his Fifth Amendment privilege against self-incrimination, Fahey's testimony could not be produced

---

[7] In *Arthur v. Parish*, 150 Or 582, 588, 47 P2d 682 (1935), this court said:

"Some loose expressions may be found in various opinions of this court relative to the exercise of discretion in granting new trials, but we think no discretion is involved concerning positive rules of law."

at trial.[8] Defendants assert that the conjunctive use of "and" between "discovered" and "produced" in the text of the rule means that evidence known before trial but *not available for use* at trial can qualify as newly discovered evidence. Defendants rely on the six-part standard that this court enunciated in *Arnold* for the proposition that newly discovered evidence need not be discovered after trial if it was discovered before or during trial but, in the exercise of reasonable diligence, it could not be produced at trial.

Plaintiffs disagree with that proposition. Relying on the text of the rule and this court's decisions interpreting it, including *Arnold*, plaintiffs assert that evidence cannot be "newly discovered" if it was known to the moving party before or during trial. According to plaintiffs, the trial court did not err in denying defendants' motion for a new trial because defendants had identified Fahey as a witness before trial, and the information in his post-trial affidavit did no more than elaborate on evidence that defendants knew about before trial.

As will soon be apparent, in view of internal tension both within the text of the rule and in this court's case law interpreting it, the parties' dispute is a vexing one. Although, as explained below, we ultimately need not resolve the issue in this case, we nevertheless explore it in some detail to set the stage for its careful consideration in a future case.

As noted, ORCP 64 provides, in part:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(4)    Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial."

---

[8] Defendants also assert that the Court of Appeals correctly concluded that the information contained in Fahey's affidavit was newly discovered because it was qualitatively different from the information that defendants had before trial. In light of our disposition on review, we need not reach that argument.

On its surface, the text of the rule imposes three separate requirements: (1) the proffered evidence must be "newly discovered;" (2) it must be "material" for the moving party; and (3) it must be such that the moving party could not, in the exercise of reasonable diligence, have discovered and produced it at trial. The first requirement is our initial focal point. The ordinary meaning of the verb "discover" is "to make known something secret, hidden, unknown, or previously unnoticed" or "to obtain for the first time sight or knowledge of." *Webster's Third New Int'l Dictionary* 647 (unabridged ed 2002). That ordinary meaning, together with the fact that the "newly discovered evidence" requirement is stated separately from, and cumulatively to, the other requirements in the rule, suggests that, to qualify, proffered evidence must have been discovered after trial.

That said, as defendants observe, the reasonable diligence requirement of ORCP 64 (B)(4) refers to evidence that, in the exercise of reasonable diligence, could not be "discovered and produced" at trial. The use of the conjunctive "and" between "discovered" and "produced" arguably suggests that evidence that could not be produced at trial can be "newly discovered evidence" even if it was known before or during trial. Stated differently, the phrase "discovered and produced" suggests that, even if newly discovered evidence must—as a general rule—have been discovered after trial, an exception exists for known evidence that could not be produced at trial. Viewed accordingly, tension arguably exists between the ordinary meaning of the term "newly discovered evidence" and the further requirement that, to qualify, the evidence must be such that in the exercise of reasonable diligence it could not be discovered *and* produced at trial.

The rule's context, including this court's previous interpretation of it, also is relevant. Oregon's newly discovered evidence rule has existed in the same form—first as a statute, and now as a rule of civil procedure—for more than a century.[9] It was first mentioned by this court in *State v.*

---

[9] ORCP 64 (B)(4) is materially identical to *former* Hill's Annotated Laws of Oregon § 235 (1887), *former* OCLA § 5-802(4)(1940), and *former* ORS 17.610(4) (1977).

*Hill*, 39 Or 90, 65 P 518 (1901), where, relying on common law authorities on which the statute was based, this court described its requirements as follows:

> "A verdict may be set aside and a new trial granted, on the motion of the party aggrieved, on the ground of newly-discovered evidence material to the party making the application, and which could not with reasonable diligence have been discovered and produced at the trial. Newly discovered evidence which will justify a court in setting aside a verdict and granting a new trial must fulfill the following requirements: '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradicting the former evidence."

*Id.* at 94-95 (citations omitted).

This court consistently used identical formulations of the standard for the next 92 years. *See Oberg*, 316 Or at 272-73 (citing *State of Oregon v. Davis*, 192 Or 575, 579, 235 P2d 761 (1951)); *see also Larson v. Heinz Const. Co. et al*, 219 Or 25, 71, 345 P2d 835 (1959) (same); *State v. Edison*, 191 Or 588, 595, 232 P2d 73 (1951) (same). That formulation of the standard has its roots in the instinctive caution with which Oregon courts historically have regarded motions for a new trial based on newly discovered evidence. Among other expressions of that caution, this court has stated that such motions "are not favored." *Lane County Escrow v. Smith, Coe*, 277 Or 273, 288, 560 P2d 608 (1977). The reasons are practical. First, "[e]fficient judicial administration dictates that motions for new trials because of newly discovered evidence be granted sparingly. Otherwise, there would never be any finality to judicial proceedings." *Marshall v. Martinson*, 264 Or 470, 477, 506 P2d 172 (1973). Second, a relaxed application of the rule would encourage a party to withhold favorable evidence, as a hedge, while gambling on the outcome of a trial. *See Territory of Oregon v. Latshaw*, 1 Or 146, 147 (1854) ("In deciding motions for new trials, on account of newly discovered evidence, courts have found

it necessary to apply somewhat stringent rules, to prevent the almost endless mischief which a different course would produce.").

That preliminary discussion brings us to *Arnold*. In that case, this court applied ORCP 64 (B)(4) to a circumstance where the defendant in a child sexual abuse prosecution had learned facts during her trial that, if made known to the jury, would have damaged the credibility of an expert witness for the state. At trial, the witness had testified about her background in child development and about statements made to her by the victim regarding the defendant's alleged inappropriate touching. *Arnold*, 320 Or at 113. On cross-examination, defense counsel questioned the witness extensively about her educational qualifications. *Id.* at 114. After the witness testified, the defendant's investigator contacted the college that the witness said she had attended and learned that it had no record of her attendance. *Id.* Although defense counsel was aware of that information, he did not bring it to the attention of the trial court, nor did he ask for a continuance or call the investigator as a rebuttal witness. *Id.* at 115. After being convicted, the defendant moved for a new trial, asserting that, after a full investigation had been completed, it was apparent that the witness had lied about her educational background. *Id.* at 115-16. The trial court denied the defendant's motion because her counsel had failed to raise the matter during trial. *Id.* at 116-17. On appeal, the Court of Appeals reversed. *State v. Arnold*, 118 Or App 64, 71, 846 P2d 418 (1993).

On review, this court reversed the Court of Appeals decision. *Arnold*, 320 Or at 119-22. Because this court's previous decisions had not involved "the question of how ORCP 64 (B)(4) would operate for evidence discovered and producible during trial," this court undertook to address "for the first time [the] defendant's argument that ORCP 64 (B)(4) does not apply to evidence first discovered during trial." *Arnold*, 320 Or at 119. In addressing that argument, this court restated the *Hill/Oberg* test as follows:

   "Consequently, and consistent with *Oberg*, we hold that evidence that may justify a court in granting a new trial must meet the following requirements:

"(1)   It must be such as will probably change the result if a new trial is granted;

"(2)   It must be such as, with reasonable diligence, could not have been discovered before or during the trial;

"(3)   It must be such that it cannot, with reasonable diligence, be used during trial;

"(4)   It must be material to an issue;

"(5)   It must not be merely cumulative;

"(6)   It must not be merely impeaching or contradicting of former evidence."

*Arnold*, 320 Or at 120-21 (footnote omitted).

This court in *Arnold* concluded that the defendant's post-trial proffer did not meet the requirements of ORCP 64 B(4) and, therefore, that the trial court had no authority to grant the defendant's motion for a new trial. *Id.* at 121-22. The court pointed out that, before the case was submitted to the jury, defense counsel had specific information that the college that the witness said she had attended denied that she had ever attended there, and counsel knew that that evidence could be obtained through a subpoena. *Id.* at 121. Moreover, defense counsel never asked for a continuance or for the opportunity to issue a subpoena to procure the evidence. This court held that the evidence "was not 'newly discovered' after the trial within the meaning of ORCP 64 B(4)," *id.* at 118 n 8, and further explained:

"This case is a dispute over how much evidence had to be known and had to be usable during trial to make the balance of the evidence not such as would justify the award of a new trial. Even if some additional evidence is discovered after trial, it does not justify the award of a new trial if the evidence that was known during trial could have been used during trial for substantially the same purpose as the additional evidence that is not discovered until after trial."

*Id.* at 121.

Different understandings of this court's decision in *Arnold* lie at the heart of the parties' dispute in this case. According to defendants, in restating the *Hill/Oberg* standard, this court in *Arnold* consciously eliminated the requirement that newly discovered evidence must have been

discovered since the trial. Relying on this court's statement of the question before it as whether ORCP 64 (B)(4) "applies to evidence discovered during trial," *id.* at 113, defendants assert that, "in *Arnold*[,] this [c]ourt * * * explained that evidence discovered before the end of trial could be considered in support of a motion for a new trial." As support for that proposition, defendants point to the court's statement in *Arnold* that the reasonable diligence requirement of ORCP 64 (B)(4) "does not focus on whether the evidence was discovered before trial." *Id.* at 119.

For several reasons, the validity of defendants' characterization of the court's holding in *Arnold* is questionable. First, it is unclear what this court in *Arnold* meant by describing the issue before it as whether ORCP 64 (B)(4) "appl[ies]" to evidence first discovered during a trial. The defendant in *Arnold* specifically relied on that rule in her motion for a new trial. *Id.* at 115. Thus, it makes little sense for her to have argued (as the court understood it) that the rule did not apply to the evidence that she asserted was newly discovered.

Moreover, other passages in *Arnold* are irreconcilable with the proposition that defendants advance. As set out above, the second requirement of the standard adopted in *Arnold* is that, to justify a new trial, evidence must be such that, with the exercise of reasonable diligence, could not have been discovered *before or during* trial. The most plausible understanding of that requirement is that evidence discovered before or during trial is not "newly discovered." That understanding is reinforced by this court's statement in *Arnold* that its reformulation of the *Hill/Oberg* standard was "consistent with *Oberg*." *Id.* at 120. As discussed, that standard expressly required that newly discovered evidence must have been discovered since trial. *See Edison*, 191 Or at 595 (preexisting and known impotency of defendant not "newly discovered" evidence and insufficient for new trial on charge of rape that resulted in childbirth). Finally, to punctuate the point, in affirming the trial court's denial of the defendant's motion for a new trial in *Arnold*, this court stated: "[W]e hold that the evidence on which defendant relies was not 'newly discovered' *after the trial* within the meaning of ORCP 64 B(4)." *Arnold*, 320 Or at 118 n 8

(emphasis added). In combination, those passages suggest that, consistently with this court's longstanding jurisprudence, the phrase "newly discovered evidence," as used in ORCP 64 (B)(4), refers to evidence that was discovered after trial.

That said, yet other passages in *Arnold* support defendants' argument that this court interpreted ORCP 64 (B)(4) to provide that evidence discovered before or during trial would qualify as newly discovered evidence if it could not, in the exercise of reasonable diligence, be produced at trial. First, as defendants note, the court in *Arnold* did not include the requirement that newly discovered evidence must have been discovered since the trial in its reformulation of the *Hill/Oberg* standard. In light of its conspicuousness, it seems improbable that that omission was inadvertent.

Second, as defendants also note, the court in *Arnold* stated that "[t]he 'reasonable diligence' inquiry under ORCP 64 B(4) does not focus on whether the evidence was discovered before trial; rather, it focuses on whether the party could not with reasonable diligence have discovered and produced the evidence at the trial." *Id.* at 119-20. Even though its primary focus was on the reasonable diligence requirement, that passage suggests that the court may have believed that a party's inability to produce evidence at trial was relevant to whether the evidence was "newly discovered." After all, if known but unavailable evidence cannot be "newly discovered," there is little point to considering whether, in the exercise of reasonable diligence, such evidence could have been produced at trial.

Moreover, as noted, the third *Arnold* requirement states that the proffered evidence "must be such that it cannot, with reasonable diligence, be used during trial." *Id.* at 120. That requirement also would seem to be inapposite unless evidence discovered before or during trial would qualify as newly discovered evidence if, with reasonable diligence, it could not be used at trial. The court went on to apply that requirement, describing the ultimate question before it as "how much evidence had to be known and had to be usable during trial to make the balance of the evidence not such as would justify the award of a new trial." *Id.* at 121.

Finally, in a vigorous dissent, Justice Durham challenged the court's failure in *Arnold* to simply adhere to and reiterate the *Hill/Oberg* standard. *See id.* at 123-30 (Durham, J., dissenting) (observing that "under the traditional standard expressed in *Oberg*, unless evidence is discovered since the trial, it cannot be newly discovered"). That is, the dissent in *Arnold* understood the court to have broadened—erroneously, in the dissent's view—the meaning of "newly discovered" evidence to include evidence discovered before or during trial that could not be used at trial.

In light of the cross-currents in *Arnold*, the parties' divergent understandings of its holding are unsurprising. As noted, the parties' arguments merit further consideration in the proper case. Here, however, we need not resolve their dispute because, even if evidence that is known but asserted to be unavailable at trial could be considered "newly discovered," to qualify the evidence as such, a party must have exercised reasonable diligence to produce it at trial. As we now explain, defendants failed to satisfy that requirement.

C.  *Reasonable Diligence*

As this court indicated as long ago as 1868, where known evidence cannot be produced at trial, the most obvious recourse in the exercise of reasonable diligence is to request a postponement of trial. *See Lander v. Miles*, 3 Or 40, 44-45 (1868) (in seeking a new trial based on newly discovered evidence, "[a] party should be free from laches in not having moved for a continuance").[10] In this case, a continuance would have afforded defendants more time to investigate the

_____

[10]  *See also Warner et al v. Mitchell Bros. Truck Lines*, 221 Or 544, 552, 352 P2d 156 (1960) (upholding denial of new trial, where, in face of new evidence discovered at trial, moving party made no "application *** to delay the trial or for a continuance to permit investigation"); *State of Oregon v. Payne*, 195 Or 624, 639, 244 P2d 1025 (1952) (where party seeking new trial on ground of newly discovered evidence obtained knowledge of evidence by date of trial, "counsel should have sought to obtain the testimony of these people, and, if such was not available at that time, he should have asked for a continuance, all of which he failed to do"); *Edison*, 191 Or at 596 (upholding denial of new trial in rape case where, among other reasons, if "there was not sufficient time to make [blood tests] before the date set for trial, the court, upon a proper showing, would no doubt have granted a reasonable continuance for that purpose. No such showing was made, and no continuance was asked for."); *Cox v. Rand*, 155 Or 258, 264, 61 P2d 1240 (1936) ("It will also be observed that plaintiff did not ask for any further continuance of time in which to have the witnesses brought into court.").

disclosures that Fahey made before trial. More importantly, it would have allowed time to conclude Fahey's sentencing, which would have removed the only posited impediment to his testimony in this action. As noted, sentencing had been delayed so that Fahey could continue to work with defendants and the prosecutor to provide evidence with respect to the missing assets. Indeed, Fahey executed his affidavit immediately following sentencing and barely three weeks after the start of trial in this case.

Defendants assert that requesting a continuance would have been futile because "sentencing on the unrelated conduct would have had no effect on Fahey's right to claim a Fifth Amendment privilege to decline testimony on the fraudulent inventory deletion conduct." According to defendants, that possibility absolved them of any responsibility to request a continuance to obtain Fahey's testimony. For two reasons, we reject that argument. First, even though Fahey's criminal case involved a different set of transactions than those at issue here, Fahey agreed to cooperate with defendants' attorneys in connection with the inventory manipulation scheme at issue in this case. In short, the connection between the two matters was obvious at the time of trial in this case, and defendants had a good faith basis to seek a brief continuance to secure Fahey's testimony. Second, and moreover, we need not speculate about the effect of Fahey's sentencing. As defendants acknowledge: "After the trial, Fahey was sentenced and was then willing to provide testimony." Indeed, Fahey executed his affidavit in front of the sentencing judge immediately after sentencing. Defendants cannot plausibly argue that requesting a continuance until sentencing would have had only a speculative bearing on Fahey's willingness to testify when, in fact, he provided his testimony immediately afterwards. Their failure to do so demonstrated a lack of reasonable diligence.[11]

Reasonable diligence also required defendants actually to question Fahey further to determine whether he

---

[11] Although the trial court made no express findings with respect to the reasonable diligence requirement, in the absence of express findings, we generally presume that the court decided disputed factual issues in a manner consistent with the ultimate conclusion that it reached. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

would give any testimony that would have supported defendants' theory of the case. At the beginning of trial, defendants represented that Fahey had information as to which he would testify:

> "I'm sure he's going to probably assert some Fifth Amendment on some areas. He was—He's able to testify as to a lot of stuff, and he did in his deposition, until you get to the specific acts of embezzlement. He has a lot of relevant knowledge that doesn't—and he actually talks somewhat about the embezzlement."

> "I have never heard him not invoke the Fifth Amendment when you get to the very specific acts of his embezzlement, although—And I can't answer this question. He may very well waive that Fifth Amendment right and talk about that in this trial. I don't know the answer to that question."

Defendants' counsel stated that he was trying to "anticipate problems" and that he "basically [had] it worked out on the testimony that [could be elicited] from this witness" but that there were "two questions" where he had been told that the witness would invoke the Fifth Amendment. Further, defendants believed that the statute of limitations had run on those matters. Those statements notwithstanding, defendants never asked about the "lot of stuff" to which Fahey could testify and that defendants believed they could elicit.

Instead of pursuing that strategy, defendants' counsel asked Fahey a single question outside the presence of the jury: "Was there a time within [February 25, 2002 until December 31, 2002] when you were instructed to remove inventory off the books of [defendants]?" Fahey's attorney then advised Fahey to invoke his Fifth Amendment privilege. A colloquy with the trial court followed, and Fahey never actually invoked the privilege. Reasonable diligence required pursuing the evidence at least up to an actual invocation of the privilege. *Cf.* OEC 804 Commentary (1981) ("unavailability" "requires an affirmative ruling by the court that a privilege exists, which presupposes a claim" (emphasis added)). Thus, defendants also failed to exercise reasonable diligence by not pursuing lines of questioning as to which Fahey might not have invoked his privilege and by

not actually pursuing his assertion of privilege to the point of invocation.[12]

## III.   CONCLUSION

To summarize: Irrespective of whether evidence that is known before or during trial but is unavailable for use at trial can qualify as newly discovered evidence, defendants were not entitled to a new trial under ORCP 64 (B)(4) because: (1) defendants failed to exercise reasonable diligence by not requesting a continuance until Fahey had been sentenced in his criminal proceeding, wherein he had agreed to cooperate with defendants in this action; and (2) defendants failed to exercise reasonable diligence by not pursuing lines of questioning at trial as to which Fahey might not have invoked his privilege and by not actually pursuing his assertion of privilege to the point of invocation.[13]

Because the trial court did not err in applying the requirements set out in ORCP 64 (B)(4), we reverse the decision of the Court of Appeals, affirm the trial court's order denying defendants' motion for a new trial, and remand to the Court of Appeals for consideration of defendants' remaining assignments of error.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings. The order of the circuit court denying defendants' motion for a new trial is affirmed.

---

[12] Plaintiffs argue that defendants also failed in other ways to exercise reasonable diligence to make Fahey available to testify at trial. We do not address those arguments in reaching our conclusion.

[13] Our analysis and conclusions make it unnecessary to address plaintiffs' additional challenges to the grounds for the Court of Appeals decision.