Submitted December 21, 2011, affirmed July 5, 2012, petition for review denied January 24, 2013 (353 Or 203)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT THOMAS FAUNCE,
*Defendant-Appellant.*

Josephine County Circuit Court
04CR0818; A143601

282 P3d 960

Peter Gartlan, Chief Defender, Office of Public Defense Services, and Joshua B. Crowther, Chief Deputy Defender, filed the brief for appellant.

Robert Thomas Faunce filed the supplemental brief *pro se*.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Pamela J. Walsh, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

### NAKAMOTO, J.

Defendant was charged with and convicted of one count of murder with a firearm, ORS 163.115, and one count of felon in possession of a firearm, ORS 166.270. On appeal, defendant assigns as error the trial court's denial of his motion to dismiss the indictment with prejudice, arguing that the state violated his due process rights by failing to preserve exculpatory evidence. Defendant also assigns as error the trial court's exclusion of defendant's evidence, offered at trial to call into question the adequacy of the state's investigation of the murder, as irrelevant. For the reasons explained below, we affirm.

The facts are undisputed unless we state otherwise. Defendant was a transient individual who lived in a campsite in Josephine County near the railroad tracks behind a Wal-Mart. Mark Adams, another transient individual, lived in a nearby campsite located under a freeway overpass. Defendant obtained money by panhandling at a specific corner of the Wal-Mart parking lot, and Adams also began panhandling at that same corner. Some time before September 2004, defendant complained to Adams that he had "aced [him] out" of corner time, and defendant told Michael Walker, Adams's half-brother, that "something could happen * * * [if] people didn't behave more fairly." Around that time, defendant told another transient individual that he was angry at Adams because Adams was panhandling for beer, that it "wouldn't be worth the lead it'd take to waste him," and "I've got something for his ass."

On September 21, 2004, Walker found Adams dead in his tent at his campsite underneath the freeway overpass. Adams had suffered a fatal gunshot wound to the top of his head, and it appeared to investigators that he had been shot from outside of the tent. Notably, Adams's personal belongings had not been taken and were still at his campsite.

Police investigated the murder but could not find any footprints or ejected cartridges. The police suspected that a black powder weapon[1] had been used in the crime,

---

[1] A "black powder" is defined as "an explosive consisting of black gunpowder now used chiefly as an ignition charge and primer, as a propellant in older guns

but could not locate any wadding material[2] at the camp or in Adams's wound. During the autopsy, the doctor removed a "distorted lead ball" from Adams's head, and the doctor also believed that Adams was shot with a black powder weapon at close range.

Detective Harris served as the lead detective on the case. Walker identified defendant as a suspect, and on September 28, 2004, Harris contacted defendant at his camp. Harris spoke with defendant, who consented to his campsite being searched. During Harris's interview with defendant, he denied that he had ever been to Adams's camp, but he admitted that he knew where it was located because the *Daily Courier* had published an article on transient individuals that had included Adams. Harris later tried to locate an article in the *Daily Courier* regarding Adams and the location of his campsite, but was unable to find any such article. Once Harris explained where Adams's camp was located, defendant responded that, even if he wanted to get up to Adams's camp, he was unable to do so because of his emphysema. Defendant explained that he would have to stop every 25 yards to use an inhaler. While searching defendant's camp, the police and defendant walked approximately 100 yards, and defendant never stopped to use his inhaler.

During the search, defendant stated that he did not own any weapons, and "if [the officers] found a weapon in his camp he [did] not know anything about it" because "other people [had] been coming into his camp." He also stated that he had not fired a gun since 1998, and later told Harris that he had dry fired a gun that "Crazy Larry had tried to sell him."

At defendant's main camp, another detective found a backpack that contained a manual instructing how to operate black powder weapons, as well as packaging for

fired as a hobby * * *." *Webster's Third New Int'l Dictionary* 227 (unabridged ed 2002).

[2] According to the state,

"[t]he charge in a black powder weapon typically consists of a lead ball, seated in a patch of 'wad,' with some type of gun powder. When the gun powder is ignited (by the spark from a flint or the discharge of a percussion cap), it produces an explosive force that discharges the ball and [wad]."

wadding material. The police also found a trail leading out of the main campsite to a second campsite; and, as the police went down the trail, defendant stated that the trail led to a dead end where his dead cats were buried. At the second camp, the police discovered an "1860 .44 caliber Colt Army revolver" and black powder weapon accessories, *e.g.*, wadding, a container of pyrodex, and a brass measuring cup.[3] The black powder revolver was wrapped in a green and black tarp that was the same material found in defendant's main camp. The black powder revolver had six chambers, but only four chambers were loaded, and one chamber "had a discharged percussion cap still in place." A firearms examiner test fired the black powder revolver found at defendant's camp, and the test-fired ball was compared with the lead ball found in Adams's head. The comparison was inconclusive due to the fact that the fragments found in Adams's head were badly distorted.

A forensic chemist examined the residue found in Adams's campsite from his tent and pillow and compared it with samples of the powder seized from defendant's camp and from a sample of powder taken from one of the chambers of the defendant's revolver. The forensic chemist could not find any testable residue on the pillow case, but he concluded that the powder from defendant's camp and revolver were Pyrodex and the powder from the tent was consistent with "burnt material of Pyrodex or a pyrotechnic material." The police arrested defendant, and he was charged with one count of murder with a firearm and one count of felon in possession of a firearm.

On April 17, 2005, several months after the police arrested defendant, a Grants Pass Police Officer arrested Brad Green and seized a .44-caliber FLLI Pietta black powder pistol and black powder accessories from Green. After Green was arrested, the firearm was held in the

---

[3] Defendant had previously possessed a black powder weapon and black powder weapon accessories. On December 18, 1998, defendant was stopped for a routine traffic matter, and an officer discovered in defendant's backpack "two .44 caliber, black powder cap and ball pistols that were loaded" and various black powder weapon accessories. Several years later, but before 2004, defendant attempted to sell a black powder weapon.

Grants Pass Property Department, and the police noted the serial number of the pistol.

On April 20, 2005, Harris received notice from the Grants Pass police concerning the black powder pistol and accessories seized from Green. Because Adams's murder involved a black powder weapon, Harris interviewed Green on April 22, 2005. During the interview, Green stated that he knew Adams and had previously been in defendant's camp with defendant. He also told Harris that he had purchased his black powder pistol three or four weeks prior to the interview. Harris went to the local gun shop to verify when Green purchased the pistol, but the shop did not keep adequate records, so Harris could not verify Green's statements.

To confirm the truthfulness of Green's statements, Harris arranged for Green to take a polygraph examination. During the polygraph examination, Green denied shooting Adams, and Green passed the polygraph. Based on the polygraph examination, Harris concluded that there was no reason to believe that Green's statements—*i.e.*, that he had purchased the black powder pistol after Adams was killed and that he did not shoot Adams—were untruthful. Harris did not believe that Green's black powder pistol had any relevance to the Adams murder, and she did not arrange to seize the pistol or collect evidence from the weapon. The police later returned the pistol to Green, despite Green's status as a convicted felon.

Meanwhile, the criminal case against defendant was proceeding. Defendant's third attorney filed several motions to compel discovery, requesting all written notes from the officers involved in the case. The attorney was not on notice regarding the Grants Pass police's previous seizure of Green's black powder pistol until he received "a cursory polygraph report" from the prosecutor. Defendant explained to his attorney that Green was "someone who had been around [Adams's] camp." Defendant's attorney then attempted to acquire more information regarding the Green matter, but the prosecutor representing the state at that time indicated that no other reports existed relating to Green. In January 2007, the trial court ordered the state to provide defendant "with a copy of the polygraph charts

on Brad Green and any and all written material related to Brad Green and his polygraph interview, including reports relied on which have not been previously disclosed."

On July 20, 2009, defendant, through a new attorney, moved to dismiss the indictment based on the state's failure to preserve Green's weapon, arguing that Green's weapon was material, exculpatory evidence in defendant's case. On July 22, 2009, over two years after the court's discovery order, Harris gave her notes on Green to the Josephine County District Attorney's Office, which in turn provided them to defendant.

On August 3, 2009, the trial court held a hearing on defendant's motion to dismiss and denied the motion. In rejecting defendant's assertion that Green's black powder weapon was exculpatory evidence, the trial court concluded, "While it is possible that Mr. Green was nevertheless the murderer of Mark Adams, the Court believes that possibility is the definition of speculation."

Defendant also contended that Green's pistol had the potential to be exculpatory evidence and that the state acted in bad faith in its investigation of Green. Defendant, in his motion to dismiss, argued that the state acted in bad faith when it returned the weapon to Green and that the state had then delayed providing him with all the information in its possession related to the Green investigation, including Harris's notes, even after the court had ordered it to do so two years earlier. The trial court rejected defendant's argument that the state acted in bad faith, noting the following acts of good faith:

"1.  Based only in the fact that Mr. Green was a transient, and in possession of a weapon remarkably similar to the alleged murder weapon, the Grants Pass Department of Public Safety promptly notified Detective Harris that Mr. Green had been arrested.

"2.  Within six days of the incident at the Crest Motel, Detective Harris contacted Mr. Green and obtained a statement from him, including his assertion that he purchased his weapon 3 or 4 weeks prior.

"3. Nevertheless, Detective Harris did not take Mr. Green's word for it; but ordered a polygraph examination."

The trial court explained that the then-current prosecutor "was unaware of the email correspondence between [defense counsel] and [the former prosecutor], which demonstrates the state's lackadaisical attitude toward" the court's order to compel, and "only recently became aware that [the court's order] had not been complied with." The trial court found that the prosecutor's delayed discovery response was not due to bad faith, stating:

"Taking all the circumstances as a whole, this Court believes that instead of bad faith on the part of the state, the primary culprit here was a continual lack of inertia caused by the overall delay in the case, which was primarily caused by the defendant's request that his first, second, and third defense attorneys be removed. In particular, had Mr. Berlant not been removed at the defendant's request, this Court believes that the state's non-response to Judge Baker's Order would have been quickly resolved.

"* * * Again, going back to the result of Mr. Green's polygraph, this Court has found that all this material, including the gun and the reports, are ultimately not favorable to the defendant's case. The Court believes the district attorney had the same attitude and, rather than hiding the ball[,] was merely inattentive concerning information it believed to be unimportant."

At his bench trial, defendant sought to offer testimony from several witnesses to call into question the adequacy of the state's investigation of the murder. In his offer of proof, defendant introduced evidence that Green had spoken with the police in 2004; Green was a local transient who possessed a black powder weapon that was later seized by the police; and Harris had interviewed Green, but his weapon was then returned to him. The trial court admitted defendant's evidence for the limited purpose of showing that other transients also had black powder weapons, but disallowed its use for "impeaching" the state's overall investigation of the murder. The trial court convicted defendant of murder with a firearm and felon in possession of a firearm.

On appeal, defendant first assigns as error the trial court's denial of his motion to dismiss, arguing that the state violated his due process rights by failing to preserve Green's black powder pistol and failing to disclose Harris's notes in a timely manner. Defendant also assigns as error the trial court's ruling that the evidence defendant sought to introduce regarding Green and his weapon was admissible only for a limited purpose and not to "impeach" the state's investigation. In a supplemental *pro se* brief, defendant makes four assignments of error, which we reject without further discussion. We discuss each of defendant's other assignments of error in turn.

First, defendant reprises his argument that, because the police failed to preserve Green's black powder pistol, his due process right to access material exculpatory evidence was violated. At the same time, defendant asserts a violation of his compulsory right to process under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, but he acknowledges that this court has adopted the due process analysis for a challenge to the state's withholding of material favorable evidence under the compulsory process clauses. *See State v. Zinsli*, 156 Or App 245, 252, 966 P2d 1200, *rev den*, 328 Or 194 (1998) (as to "whether evidence is material and favorable, the compulsory process analysis is identical to the due process analysis"). "In determining whether a constitutional right of defendant was violated, we are bound by the trial court's findings of fact so long as they are supported by sufficient evidence in the record * * * [and] must decide whether the trial court correctly applied legal principles to those facts." *Zinsli*, 156 Or App at 249-50 (internal citation omitted).

Because the Oregon Constitution does not contain a due process provision, we must turn to the Due Process Clause of the Fourteenth Amendment to the United States Constitution to determine whether the state violated defendant's due process rights. *Id.* at 249 n 1. The Due Process Clause provides, "[N]or shall any State deprive any person of life, liberty, or property, without due process of the law." The Due Process Clause guarantees a criminal defendant access to evidence *in the prosecutor's possession* "irrespective of the good faith or bad faith of the prosecution" when that

evidence is favorable to the defendant and is material either to guilt or to punishment, *Brady v. Maryland,* 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963); the suppression of the evidence is prejudicial to the defendant's right to a fair trial, *United States v. Agurs,* 427 US 97, 108, 96 S Ct 2392, 49 L Ed 2d 342 (1976).

In contrast, when the state fails to *preserve* evidentiary material, the good or bad faith of the prosecution's actions may be relevant to the court's inquiry, depending on the quality of the evidence. To establish a due process violation resulting from the state's failure to preserve evidence, a defendant need not show that the state acted in bad faith if it "was apparent before the evidence was destroyed" that the evidence was favorable and was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State ex rel Juv. Dept. v. Huskey,* 130 Or App 419, 423, 882 P2d 1127 (1994), *rev den,* 320 Or 567 (1995) (quoting *California v. Trombetta,* 467 US 479, 488, 104 S Ct 2528, 81 L Ed 2d 413 (1984) (internal quotation marks omitted)). Favorable evidence for a defendant can be either exculpatory or impeaching. *State v. Deloretto,* 221 Or App 309, 321, 189 P3d 1243 (2008), *rev den,* 346 Or 66 (2009).

The requirements are different when the defendant claims that the state failed to preserve merely "potentially useful" evidence, such as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 US 51, 57, 109 S Ct 333, 102 L Ed 2d 281 (1988). In that event, the defendant must show that the state acted in bad faith. *Id.* at 58. Thus, "the applicability of the bad-faith requirement in *Youngblood* depend[s] *** on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." *Illinois v. Fisher,* 540 US 544, 549, 124 S Ct 1200, 157 L Ed 2d 1060 (2004).

Defendant argues that Green's black powder pistol was material exculpatory evidence for two reasons. First, defendant argues that the state should have preserved Green's pistol because it was exculpatory evidence by its mere existence. Defendant asserts that Green's pistol

could have created reasonable doubt as to the shooter's identity because Green's pistol was "remarkably similar to" defendant's gun. Although we agree that Green's pistol was relevant, additional evidence to corroborate defendant's defense—that another transient individual in the community had a black powder weapon and shot Adams—we disagree that this evidence alone is exculpatory. At trial, defendant was able to establish that Green had a similar black powder pistol, so the mere admission of the pistol itself into evidence would have added little to his defense.

Second, defendant contends that forensic evidence from Green's weapon could have created doubt that the black powder weapon found near defendant's camp was actually the one used in the Adams murder. According to defendant, because Green and his pistol could no longer be found, he was unable to obtain comparable evidence by other reasonably available means. We agree with the state that, even if Green's pistol had been preserved for forensic testing, it is entirely speculative whether the results would have been favorable to defendant. Because the lead ball removed from Adams's head was so badly damaged, comparisons with the weapon found at defendant's camp were inconclusive, and there is no indication that comparison with any other black powder weapon would have been more conclusive. It is mere speculation that test-firing Green's weapon, to compare with the lead ball removed from Adams's head, would have given defendant anything but similar inconclusive results. *Cf. State v. Hendershott*, 131 Or App 531, 535, 887 P2d 351 (1994), *rev den*, 329 Or 587 (1995) ("Defendant, however, has failed to show that a forensic inspection of the car would have produced any *favorable evidence*." (Emphasis added.)).

Defendant argues, however, that he could have conducted tests other than test-firing Green's gun, such as testing to determine whether there was trace evidence of the victim's blood on the gun, testing the black powder in Green's possession, and testing to determine whether Green's gun had wadding in the chamber or used a grease alternative. Again, it is highly speculative that any of these tests would have exculpatory evidentiary value to defendant's case. The state's forensic expert explained at trial that he rarely finds blood on a gun and that traces of blood dissipate over

time. Because Green's weapon was seized seven months after Adams's murder, it is unlikely that the weapon would have had traces of blood that would reveal any potential forensic evidence. With respect to testing the black powder in Green's possession, the forensic chemist who examined the gun powder residue found at Adams's campsite was unable to determine the exact type of powder residue that was from Adams's tent, but he was able to conclude that it was consistent with "burnt material of Pyrodex or a pyrotechnic material"; thus, it is also speculative that the results from a residue test of Green's power would have any exculpatory evidentiary value. Accordingly, given the speculative nature of the forensic tests that defendant contends he could have performed, Green's weapon was at best "potentially useful," not material exculpatory evidence, and we need not determine whether defendant was able to obtain comparable evidence by other reasonably available means.

Defendant argues, in the alternative, that if Green's weapon is not material exculpatory evidence, then it is potentially useful evidence, and he contends that the state acted in bad faith when it failed to preserve the weapon. *See Youngblood*, 488 US at 58 (absent "bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Defendant first contends that the police knew the exculpatory value of that weapon when the police returned it to Green, and that contention, according to defendant, was supported by the trial court when it noted that "the release of Mr. Green's weapon back to him was an error, among other reasons because Mr. Green was a convicted felon." Secondly, defendant points to the state's pattern of delay in notifying him about the police investigation of Green, which he views as a sign of bad faith. Lastly, defendant asserts that, because police failed to follow routine policies and procedures when it returned Green's weapon despite Green's status as a possible suspect and convicted felon, there was significant evidence that the state acted in bad faith.

We reject defendant's first bad-faith argument (police knowledge that Green's weapon was exculpatory)

and his third bad-faith argument (police's failure to follow its routine policies and procedures). As we explained above, the evidentiary value of Green's weapon to defendant's case is speculative. In addition, the trial court found that the police did not know that Green's weapon was evidence favorable to defendant and instead acted in good faith to investigate Green, noting the following supporting facts: the police promptly notified Harris that Green had been arrested; Harris contacted Green and obtained statements from him; and Harris ordered a polygraph examination to confirm the truthfulness of Green's statements. Harris returned Green's weapon only after Green passed the polygraph examination, and she explained at trial that she often relies on polygraph examinations for her investigations. Although we agree that the police failed to follow its routine policies and procedures when it returned Green's weapon to him, given that he was a felon, the trial court's finding that the state was merely negligent in doing so is supported by the record, and the state's negligence does not amount to bad faith for failing to preserve potentially useful evidence. *See Huskey*, 130 Or App at 424 (noting that the trial court found that, "[a]t most, the failure to preserve the shoe print was 'simple negligence'" and not the result of bad faith).

And, although we agree with defendant that the state delayed in providing him with all the information involving the Green investigation, including Harris's notes, even after being ordered to do so by the court, the record supports the trial court's finding that those delays were not orchestrated in bad faith. The trial court explained, in its denial of defendant's motion to dismiss, that the then-current prosecutor who tried the case "was unaware of the email correspondence between [defense counsel] and [the former prosecutor], which demonstrates the state's lackadaisical attitude toward" the court's order. The prosecutor was unaware of Harris's notes, but, once she received the handwritten notes relating to Green's polygraph examination, she provided them to defendant before trial. Additionally, the trial court reasoned that the state's delay in complying with the court's order to compel was, in part, due to the multiple changes in defense attorneys, noting that:

"[t]aking all the circumstances as a whole, this Court believes that instead of bad faith on the part of the state, the primary culprit here was a continual lack of inertia caused by the overall delay in the case, which was primarily caused by the defendant's request that his first, second, and third defense attorneys be removed."

The trial court found that the state believed that both the gun and Harris's notes were not favorable to defendant and that its failure to provide Harris's notes until two years after the court's order to compel was not willful, but rather "inattentive concerning information it believed to be unimportant."

Because defendant cannot meet his burden to show that the state's failure to preserve Green's weapon was due to bad faith, defendant's claims of constitutional violations fail. Accordingly, the trial court did not err in denying defendant's motion to dismiss the indictment.

Defendant's second assignment of error is that the trial court erred in ruling that evidence regarding Green was irrelevant and therefore inadmissible for the purpose of "impeaching" the police's investigation of Adams's murder. After defendant made an offer of proof, the trial court ruled:

"THE COURT: *** I understood the, the potential relevance of the information concerning Brad Green was, was narrowed down to two areas by [defense counsel]. One was ***

"*****

"THE COURT: Whether, whether there were transients [that] had black powder weapons ***

"*****

"THE COURT: in the Josephine County community. And the second was the potential, or the impeachment of general police procedures. Now with respect to that, the latter, I didn't hear any evidence during the initial investigation starting on September 1st and, of 2000, 21st of 2004 and moving forward that at any time Brad [Green] is ever suggested as a possible suspect, unlike others. And so I think the fact that the police may have not gone looking for Brad [Green] ***.

"\* \* \* \* \*

"THE COURT: Brad Green is not impeachment, and so it's not admissible for that purpose. As for the second that the, the testimony concerning Brad Green is relevant to show that people that were transient also had black powder weapons, I see some minimal relevance to that, and so I'm going to allow the testimony for that."

The merit of defendant's second assignment of error turns in part on logical relevance. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. A trial court has no discretion under OEC 401 to exclude evidence that is logically relevant, and the relevance threshold is low. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). We review whether evidence is relevant under OEC 401 for errors of law. *Id.*

Here, defendant offered evidence that Harris did not preserve or test Green's weapon and police later returned it to Green to call into question the police's investigation. Defendant's factual theory at trial was that the police failed to properly investigate other potential suspects, like Green, who were transients in the community who possessed black powder weapons and that someone else shot Adams. We agree with defendant that the evidence regarding Green was logically relevant to whether the police properly investigated other potential suspects, even though Green was not a named suspect.

Having determined that the trial court erred in limiting the evidence defendant sought to introduce regarding Green, we must now decide whether the error requires reversal and remand for a new trial. The state argues that, even if it was error to limit the use of the evidence regarding Green, the error was harmless. We agree.

An evidentiary error is reversible only if it is prejudicial. *State v. Dimmick*, 248 Or App 167, 176, 273 P3d 212 (2012); *see also* OEC 103(1) ("Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a

substantial right of the party is affected[.]"); ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party."). We therefore affirm a conviction despite evidentiary error if we can say that there is "little likelihood that the particular error affected the verdict[.]" *Dimmick*, 248 Or App at 176; *see also State v. Davis*, 336 Or 19, 33-34, 77 P3d 1111 (2003) (concluding that the statements that the defendant proffered were not merely cumulative of the admitted evidence because they were "qualitatively different than the evidence that the jury heard").

As noted, defendant tried his case in front of the court, not a jury, and the trial judge admitted the evidence to show that other transients had black powder weapons. The fact that other transients had black powder weapons supports the upshot of defendant's factual theory of the case, namely, that someone else shot Adams. Defendant's proffered evidence to "impeach" the state's investigation demonstrated essentially the same thing as the admitted use of the evidence—the possibility of another murder weapon and a different perpetrator—and, thus, was not different in nature. And because the trial court rejected defendant's factual theory of the case based on the admitted use of the evidence, we conclude that its limitation of the evidence was harmless.

Affirmed.