698 February 14, 2024 No. 94

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

REES GILMORE DIKEOS,
*Defendant-Appellant.*

Yamhill County Circuit Court
18CR36194; A173183

Ladd J. Wiles, Judge.

Argued and submitted September 26, 2023.

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Judgment of dismissal on count of tampering with a witness reversed and remanded; otherwise affirmed.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for second-degree murder, ORS 163.115, and from a judgment of dismissal for the charge of tampering with a witness, ORS 162.285. On appeal, defendant has filed four briefs: an opening brief submitted through counsel, a *pro se* supplemental brief, a second supplemental brief submitted through counsel, and a reply brief.[1] Several of defendant's claims of error revolve around evidence that officers found in the victim's trash bin. Officers photographed those items—a stocking cap and a firework box—but testified that they had then returned the items to the garbage. Based on the officers' explanations that they had not retained the physical items, defendant moved pretrial to dismiss, arguing that the state violated his due process rights by failing to preserve exculpatory evidence. The trial court denied that motion and, at trial, the officers explained that they had disposed of the evidence because they could not link the items to the victim's death.

After trial, and while defendant's appeal was pending, the state found the evidence in its possession. The stocking cap and firework box had not, as the officers testified, been discarded; instead, the items had been put in a box and sealed with evidence tape, initialed by one of the officers who had testified that he had returned the evidence to the trash, given its apparent lack of evidentiary value. Defendant again moved to dismiss and also moved for a new trial under ORCP 64 B based on the discovery of new evidence. The trial court denied both of those motions.

On appeal, defendant assigns error to the denial of both of his motions to dismiss, as well as the denial of his motion for a new trial. Defendant further assigns error to the trial court's denial of his motion for a mistrial after defendant learned midtrial that the state failed to disclose a conversation that it had with a key witness. In his third assignment of error, defendant asserts that the trial court erred when, after granting his motion for judgment of acquittal on the tampering with a witness charge, the court

---

[1] Defendant's *pro se* supplemental brief raises the same three assignments of error as in defendant's opening brief.

entered a judgment "dismissing" that charge, rather than acquitting him. We reverse the judgment of dismissal for defendant's tampering with a witness charge and remand for an entry of a judgment of acquittal on that charge. We otherwise affirm.

## I.  BACKGROUND FACTS

We provide a brief overview of the background facts, which are undisputed unless we state otherwise. We describe the facts related to the evidence that officers testified that they had discarded, but that the state ultimately found in its possession, in a separate section below.

Defendant and the victim, J, were acquaintances who both shared a passion for guns. Defendant would frequently purchase firearms from J. The day before J died, J put defendant in contact with a person who was also purportedly willing to sell defendant a firearm. However, when defendant met with J's contact, the individual robbed defendant. During the robbery, defendant fired some shots, but no one was hit.

Defendant contacted J the night of the robbery through Facebook Messenger, on which defendant used the username "Hwhite Mahn." Defendant did not mention the robbery or the shooting; instead, defendant told J that he had not met up with J's contact at all. However, defendant did tell J that he was not willing to do future transactions with any of J's friends and that he "[didn't] want to talk to or see anyone [that he didn't] know." J told defendant that he could help defendant secure a gun and they made plans to meet the following day for defendant to give J cash for a gun and some drugs.

The next day, defendant and J met outside of a business in Newberg. J arrived at the location with his friends, Haney and Corral, who were also J's housemates. When defendant arrived, J approached defendant and they exchanged a few words. During this interaction, defendant shot J multiple times, causing J's death. Defendant ran away unharmed.

After defendant fled, police arrived and interviewed witnesses. Several witnesses reported that they had heard

a number of fireworks go off as the shooting occurred. At least one witness suggested that the fireworks could have been used as a possible diversion to distract from a planned shooting.

That evening, officers interviewed Haney, and he told the officers that he knew that J had planned to meet someone who went by the name of "Hwhite Mahn." The police were ultimately able to connect defendant to J's death following a series of interviews and after learning that defendant was the user responsible for the "Hwhite Mahn" Facebook account.

The state charged defendant with one count of second-degree murder, ORS 163.115, and one count of tampering with a witness, ORS 162.285. At trial, the primary issue was whether defendant acted in self-defense.

During the trial, Haney testified that he witnessed the shooting. Haney recalled watching J approach someone in an alley who he identified as defendant. Haney described that he saw J open his arms as if to give defendant a hug. According to Haney, defendant then took two steps back and fired three or four shots into J's stomach. In response, Haney testified that he ran towards J and that defendant shot at him twice but missed. Haney stated that, in response to getting shot at, he pulled out his .380 caliber pistol and fired shots at defendant, but that defendant was able to run away.

Defendant also testified at trial but presented a different version of events; defendant claimed that he shot J in self-defense. Defendant testified that J approached him that night with his hands in his pockets. As J approached, defendant recalled that he noticed two of J's friends walking away from J and that J asked him, "what's up, you got the money[?]" Defendant explained that this made him "really nervous" because the combination of the presence of J's friends and J's behavior was "reminiscent of what [he] had seen or what—[he] had been told" when he got robbed the night before. Defendant testified that he asked J what was going on with J's friends and that J responded, "[O]h which homies, which homies, the ones you shot at[?]" Defendant stated that J then pulled out a pistol and cocked it, which

made defendant think that J intended to shoot him. In response, defendant testified that he shot J three times. Defendant further testified that as he fled, he turned around to see J on the ground, still holding his gun. According to defendant, it was J, and not Haney, who then shot at defendant but missed. Defendant was able to run away unharmed.

During closing argument, the state argued that defendant believed that J had set him up to be robbed the day before J's death. As such, the state's theory of the case was that defendant shot and killed J as revenge for J setting him up to be robbed. Consistent with defendant's self-defense theory, during closing argument, defendant argued that J and his housemates—Haney, Corral, and Schaad—had plotted to rob defendant the night of the incident. In particular, defendant contended that he shot J three times "in a moment brought on by fear that he was about to be robbed at gunpoint or that [J] was actually going to shoot him."

The trial court dismissed defendant's tampering with a witness charge and the jury ultimately found defendant guilty of second-degree murder.

## II. FACTS RELATING TO STOCKING CAP AND FIREWORKS BOX

As noted above, three of the claims of error on appeal involve evidence that officers initially said they did not retain, but that the state ultimately located in an evidence locker after defendant had been tried and convicted. We describe the facts giving rise to those claims of error in detail here.

As part of the investigation, the state recovered and photographed certain physical evidence, but, when defense counsel sought access to that physical evidence from the state, the state informed counsel that the physical evidence had been "destroyed." The particular physical evidence at issue consisted of several pieces of clothing, including a stocking cap with eye holes cut out, as well as an empty box of mortar style fireworks; the state had recovered those items four days after the shooting from the trash can outside of the residence that J had shared with a number of

witnesses, including Haney, Corral, and Schaad. After the state informed him that the evidence had been destroyed, and before trial, defendant moved to dismiss, arguing that "he was deprived of due process when state actors failed to preserve the physical evidence, and thus destroyed potentially extremely important and possibly exculpatory evidence."

During the hearing on defendant's motion to dismiss, Sergeant Baltzell, an officer involved in the investigation, testified. He explained that, as part of the investigation, officers arranged to have Waste Management seize the garbage can from the residence that J shared with Haney, Corral, and Schaad. At this point, officers had not yet identified defendant as a suspect and "had no real clear direction on where to go," so they seized the garbage can to look for items that "link[ed] to what occurred [the] night of the incident."

Baltzell explained that he and Detective Eubanks looked through the trash bags and photographed several items that had been recovered, including articles of dark clothing, an empty box of mortar style fireworks, and a black stocking cap with holes cut out for eyes. However, Baltzell testified that he decided not to retain those items because he "didn't see them as being associated with the homicide" and did not consider them to have "any evidentiary value." He acknowledged knowing that someone had reported hearing fireworks around the time of the shooting, but he further testified that, at the time he searched the garbage, he "didn't see a connection between a firework going off and the homicide." Similarly, he acknowledged that, at some point in the investigation, he became aware that another witness reported seeing someone present at the scene wearing a "stocking cap" or a "beanie with a bill" and that he learned "later" in the investigation that a video from a surveillance camera positioned near the scene showed Corral prior to the shooting wearing a stocking cap.[2] However, Baltzell explained that, at the time he discarded the items,

_____

[2] Based on Baltzell's testimony at the pretrial hearing, it is unclear whether, at the time that he discarded the evidence, he had already seen the video. Defendant below did not rely on the footage from the surveillance camera in support of his motion to dismiss so it is unnecessary for us to determine how, or whether, to factor in the video.

he did not connect the stocking cap with the eyes cut out to the shooting; in his words, "nobody said that somebody was wearing a ski mask." The officers thus did not submit either of those items for any forensic testing and, Baltzell testified, discarded them. The trial court denied defendant's pretrial motion to dismiss, a ruling that we explore in greater detail below.

After defendant's trial and conviction and after defendant filed his appeal, the state discovered a box at the Newberg Police Department that contained the evidence that police had recovered from the garbage can outside of J's residence. Contrary to Baltzell's prior testimony during the pretrial hearing on defendant's motion to dismiss and during trial—that he had not seen any evidentiary value in the items and, thus, had discarded them—the box containing the evidence had been in the state's possession since it was initially recovered.

After the state discovered the box of evidence, the parties jointly moved this court for a limited remand to the trial court for the purposes of deciding a motion for a new trial during the pendency of this appeal. We granted that motion.

At the hearing on defendant's motion for a new trial, defendant also made an oral motion to dismiss "based on the [s]tate's negligence in preservation of these objects." During the hearing, Baltzell and Eubanks both testified. Baltzell recalled testifying at defendant's pretrial hearing that he and Eubanks had decided to throw away the items retrieved from J's garbage can, including clothing, a stocking cap with eye holes cut out, and an empty box of fireworks, because they did not see any evidentiary value in those items at the time. Baltzell further testified that he did not believe that the items had been placed into evidence; however, he did acknowledge that the box of evidence had been discovered with evidence tape on it and that he had written his initials on the box and dated it January 16, 2018. Baltzell stated that he had no memory of putting the box in the evidence locker or anything similar and that he did not recall initialing or dating the tape on the box. Baltzell testified that he "truly believed" that the items had been thrown away.

Eubanks testified that an evidence technician had located the missing box of evidence in a secure area of the Newberg Police Department's garage. Eubanks explained that, after he informed the district attorney's office that the box had been discovered, he sent the items to the Oregon State Police Crime Laboratory for testing. Eubanks testified that the test results indicated that hair fibers found on the stocking cap contained a mixed profile assumed to contain DNA from three contributors, including at least one male. Eubanks further testified that the lab had found fingerprints from one of J's housemates, Schaad, and one print from J on the empty box of fireworks. Additionally, Eubanks stated that he did not recall anyone at the police department deciding to put the items in a box or to keep the items as evidence. Eubanks testified that he did not believe that the presence of the evidence tape and dated initials indicated that the box contained evidentiary items because "a number was never given to it[,] and it was not cataloged or treated as evidence." The trial court denied defendant's post-trial motion to dismiss and his motion for a new trial—rulings that we consider separately and in greater detail below.

### III.   MOTION FOR A NEW TRIAL

We begin with defendant's second supplemental assignment of error, in which defendant contends that the trial court erred in denying his motion for a new trial. We begin there because, in our view, it is more appropriate to begin with what we know the facts to be, rather than with what the officers described during the pretrial motion to dismiss hearing and during trial. As explained above, after defendant learned that the state had discovered in its possession the box of evidence containing the items originally retrieved from the trash can outside of J's shared residence and after we granted the limited remand, defendant filed a motion for a new trial based on new evidence. In particular, defendant argued that the physical items themselves, the fingerprints on the fireworks box, and the hair fibers on the stocking cap constituted newly discovered evidence that was exculpatory and warranted a new trial under ORCP 64 B.[3]

---

[3] Defendant's motion and arguments below (and again on appeal) raise only a claim that the trial court should grant the new trial under ORCP 64 B; neither

The trial court denied defendant's motion for a new trial. It found that Eubanks and Baltzell did not "intentionally li[e]," but that "they certainly were mistaken about facts" because of "negligent, maybe reckless, just—just incorrect handling of what was seized." Nevertheless, as "egregious" and "upsetting" as the officers' conduct was, the court decided that the newly discovered evidence was not "material in the sense that it would change the results" as ORCP 64 B requires. We review the trial court's denial of the motion for a new trial for an abuse of discretion, *State v. Disorbo*, 54 Or App 877, 882-85, 636 P2d 986 (1981), and affirm.

ORCP 64 B(4) allows for a new trial based on newly discovered evidence. A trial court may grant a new trial based upon newly discovered evidence if the evidence meets six requirements:

> "[It must] (1) be such as will probably change the result if a new trial is granted; (2) have been discovered since the trial; (3) be such as could not have been discovered before the trial by the exercise of due diligence; (4) be material to the issue; (5) not be merely cumulative of former evidence; and (6) not be merely impeaching or contradictory of former evidence."

*State v. Howard*, 205 Or App 408, 416, 134 P3d 1042, *rev den*, 341 Or 198 (2006) (internal quotation marks omitted). Whether evidence would "probably change the result if a new trial is granted" is an inquiry that goes to the materiality of that newly discovered evidence. *State v. Simon*, 294 Or App 840, 871 n 29, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019) ("The issue for the trial court, therefore, narrowed to the materiality of the evidence—whether it would 'probably change the result if a new trial is granted.'" (Quoting *Greenwood Products v. Green Forest Products*, 357 Or 665, 684, 359 P3d 219 (2015)).

---

below nor on appeal does he suggest that he was constitutionally entitled to a new trial. For example, he does not develop a claim under *Napue v. Illinois*, 360 US 264, 269, 79 S Ct 1173, 3 L Ed 2d 1217 (1959), which governs due process claims centered on the presentation of false testimony at trial, and the failure to correct such testimony, when the falsity is not discovered until later. Rather, defendant's due process claims, as argued both to us and the trial court, have centered exclusively on the state's ostensible failure to preserve physical evidence. Accordingly, we are not called upon to address the due process implications of Baltzell's trial testimony regarding his disposition of the evidence.

At the outset, we note our agreement with the trial court's conclusions that the officers' conduct was negligent and, in its words, "upsetting." Defendant did not have the benefit of what is indisputably relevant evidence during his trial because of the officers' conduct. That said, ORCP 64 B requires a defendant to satisfy six inquiries and we defer to the trial court's findings of fact "if they are supported by evidence in the record." *Golik v. CBS Corp.*, 306 Or App 202, 213, 472 P3d 778 (2020); *Simon*, 294 Or App at 872 (stating that the defendant, "as the moving party," had the burden to prove that "the newly discovered evidence * * * would likely change the outcome at trial"); *cf. also Gragg v. Hutchinson*, 217 Or App 342, 347, 176 P3d 407 (2007), *rev den*, 344 Or 401 (2008) ("Because the trial court is usually in a better position to evaluate the circumstances of each case and the prejudicial effect, if any, of any claimed irregularity, we defer to the trial court's conclusions regarding prejudice." (Internal quotation marks omitted.)). So framed, we agree with the trial court that a new trial was not appropriate.

Defendant was able to present evidence of the empty box of fireworks and the stocking cap at trial through photographs and through testimony from Eubanks and Baltzell; thus, the question reduces to whether the admission of the physical items themselves or the fingerprints or DNA found on them would probably change the result. To recap, officers found the stocking cap and fireworks box in the trash can outside of J's shared residence; testing of those items revealed that there were hair fibers on the stocking cap that contained a mixed profile assumed to contain DNA from three contributors, including at least one male, and that there were fingerprints on the empty box of fireworks—multiple fingerprints from one of J's housemates, Schaad, and one fingerprint from J.

As explained above, defendant's theory of the case was that J and his housemates had planned to rob defendant that night and that, in furtherance of that plan, J had had a gun and threatened defendant with it, causing defendant to shoot J in self-defense. During trial, Schaad testified that the empty box of fireworks belonged to him and that he had set off the fireworks roughly a week before the

shooting. However, defendant argued that the fireworks box found in the trash can was the box of the same fireworks that had been launched during the shooting and that the fireworks were intended to hide the noise of the shooting that J and his housemates anticipated would occur during their robbery of defendant. As to the stocking cap, defendant asserted that witnesses and surveillance footage in evidence indicated that, before the shooting, Corral was wearing a cap that matched the cap found in the trash, and that shortly after the shooting, Corral had removed the cap and disposed of it. Defendant contended that the fact that the cap had eye holes cut out of it supported his theory that J and his roommates intended to rob defendant.

With that background in mind, we begin by considering the evidentiary value of the stocking cap and the DNA found on it. At trial, a critical point of dispute between the state and defendant was whether the stocking cap found in the trash was the same hat that Corral was seen wearing the night of the shooting. However, neither the physical cap, the hairs found on it, nor the DNA from the hairs would add anything to the jury's ability to decide to whom the cap belonged or whether it was in fact the same hat Corral was seen wearing that night. Thus, the cap, hairs, and DNA were not evidence that would "probably change the result." *Simon*, 294 Or App at 871 n 29 (internal quotation marks omitted).

Similarly, who set off the fireworks, and why, was important to defendant's self-defense theory. However, even against that backdrop, the physical fireworks box and the fingerprints found on it are not evidence that would probably change the result. That is so because Schaad testified that the empty box of fireworks belonged to him and because defendant was able to present photographs of and testimony about the fireworks box to establish that the box had been found in the trash outside J's and his housemates' residence. In light of that evidence, Schaad's fingerprints on the fireworks box would add nothing to the jury's consideration of defendant's self-defense theory. As to J's fingerprint, it would add some minimal amount of persuasive value to defendant's theory that J was part of a conspiracy with

his housemates. However, given that defendant was able to present evidence that the fireworks box was discovered in the trash outside J's and his housemates' residence and given that Schaad testified that the fireworks box belonged to him, we agree with the trial court's assessment that that minimal additional persuasive value would not probably change the result.

Defendant also contends that he is entitled to a new trial because this newly discovered evidence constitutes additional evidence that could be used to impeach the officers' testimony. In particular, defendant points to the fact that, until the objects were rediscovered after trial, "no officer acknowledged that they had lost the evidence. Instead, Baltzell testified that the objects were photographed but not collected." Thus, defendant argues that he is "entitled to a new trial where he can *** present the deeply conflicting versions of Baltzell's story to a new jury." We do not agree. Under the standard articulated in ORCP 64 B(4), impeachment value alone is not enough to justify a new trial.

Finally, to the extent that defendant contends that the jury's assessment of his self-defense theory would have been affected by Baltzell's testimony—later shown to be incorrect—that he discarded the cap and fireworks box because he "couldn't link [the items] to the *** homicide," we disagree. Although we agree with defendant—and the trial court—that it is concerning that Baltzell's untrue testimony was presented to the jury, we nevertheless agree with the trial court's assessment that it did not affect the jury's assessment of defendant's self-defense theory. As explained above, the information that defendant had about the stocking cap and fireworks box—testimony from the officers about what they found and photographs of the items—was the key information that defendant needed to support his self-defense theory. At trial, defendant emphasized that key information and questioned Baltzell's investigation based on his purported choice to discard the evidence notwithstanding its potential importance. Under these circumstances, the fact that Baltzell testified that he had not believed that the evidence was worth saving, and therefore, had returned it to the garbage after photographing it, did not undermine the jury's

evaluation of defendant's self-defense theory and, in particular, its assessment of whether the state had met its burden of proving beyond a reasonable doubt that defendant did not act in self-defense. *Cf. State v. Acree*, 205 Or App 328, 335-36, 134 P3d 1069 (2006) (concluding that the defendant was entitled to a new trial where the newly discovered evidence "probably would have led a reasonable person to a different conclusion from that reached by the jury" because the "only evidence probative of [the] defendant's guilt" was the officer's testimony that the scales were found in plain view, testimony that was contradicted by video evidence discovered after trial).

We thus conclude that the trial court was not required to grant defendant's motion for a new trial.

## IV.  PRETRIAL MOTION TO DISMISS

Defendant's pretrial motion to dismiss—made before the state located the evidence—was based on defendant's claim that the items, which the parties then believed had been discarded, supported his theory that he was acting in self-defense from a plot that J and J's friends had to harm defendant.[4] More specifically, defendant argued that his Due Process rights were violated by the failure to preserve the evidence because it was apparent that the evidence in question was relevant because the stocking cap looked like a hat that a witness reported seeing an individual involved in the shooting wearing at the scene. Defendant also argued that the fireworks box had apparent evidentiary value because the fireworks box matched the style of fireworks that were heard in the area at the time of the incident. Defendant maintained that the stocking cap supported his theory that J and his friends intended to harm him; relatedly, defendant also argued that the box of fireworks suggested that J and his friends had specifically planned to shoot him and had anticipated using the fireworks as a diversion tactic.

The state argued that the evidence at issue had little or no evidentiary value and that the officers did not act in bad faith.

_____

[4] To the extent that the state argues that defendant's pretrial motion to dismiss is moot given that the evidence at issue was discovered post-trial, we disagree. Its subsequent discovery does not change the fact that defendant faced trial without the benefit of the evidence.

The trial court denied defendant's motion to dismiss, concluding that the state did not violate defendant's right to due process when the officers discarded[5] the evidence. The trial court explained that the evidence at issue did not constitute material, exculpatory evidence—a legal term of art, as discussed below—because its value was "not immediately apparent." The trial court also concluded that the items did not constitute potentially useful evidence— also a legal term of art, as discussed later—and that the police did not act in bad faith in discarding it.

With that factual background, we turn now to the legal standards governing the motion to dismiss. "In determining whether a constitutional right of defendant was violated, we are bound by the trial court's findings of fact so long as they are supported by sufficient evidence in the record * * * [and] must decide whether the trial court correctly applied legal principles to those facts." *State v. Zinsli*, 156 Or App 245, 249-50, 966 P2d 1200, *rev den*, 328 Or 194 (1998). The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees a criminal defendant access to evidence in the prosecutor's possession that is "material either to guilt or to punishment." *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963). Relatedly, due process also imposes a duty on the state to preserve certain evidence obtained during its investigation. *California v. Trombetta*, 467 US 479, 488, 104 S Ct 2528, 81 L Ed 2d 413 (1984). What a defendant must prove to establish a due process violation resulting from the state's failure to preserve evidence depends on the quality of the evidence at issue; that is, different tests apply depending on whether the lost or destroyed evidence constitutes "material, exculpatory evidence" or "potentially useful evidence." *State v. Faunce*, 251 Or App 58, 64, 67, 282 P3d 960 (2012), *rev den*, 353 Or 203 (2013). Regardless of the quality of the evidence, the burden is on the defendant to make the necessary showings. *United States v. Marshall*, 109 F3d 94, 98 (1st Cir 1997).

The quality of the evidence depends on the circumstances that existed before it was destroyed. If the evidence

---

[5] We frame this claim of error around "discarded" evidence, because—based on the officers' statements—that was the posture that the parties believed that the evidence was in at the time of defendant's pretrial motion to dismiss.

possessed "an exculpatory value that was apparent before the evidence was destroyed" and was of such a nature that it "might be expected to play a significant role in the suspect's defense," then it was "material, exculpatory evidence." *Trombetta*, 467 US at 488-89. In that case, a due process violation occurs if "the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. If the exculpatory value of the evidence was not apparent before it was destroyed, the evidence is "potentially useful." In that case, the defendant can establish a due process violation by proving that the state acted in bad faith when it failed to preserve the evidence. *Arizona v. Youngblood*, 488 US 51, 58, 109 S Ct 333, 102 L Ed 2d 281 (1988). Whether the state acted in bad faith "is reviewed as a question of fact." *State v. Walker*, 323 Or App 234, 241, 522 P3d 868 (2022), *rev den*, 370 Or 827 (2023).

A.	*The exculpatory nature of the evidence was not immediately apparent.*

Here, defendant argues that the stocking cap and empty fireworks box were materially exculpatory evidence for four reasons: (1) because they "would have supported defendant's theory that he was defending himself from an attempted robbery"; (2) because, as a result of the state's failure to preserve the evidence, "no one was able to test the items"; (3) because the evidence was "inherently suspicious"; and (4) because the "potential evidentiary value of a stocking cap with eye holes cut out is immediately apparent."

We address those arguments in turn, keeping in mind that the question is whether, under the circumstances as they existed before the evidence was destroyed, the evidence had apparent exculpatory value. We begin with defendant's first argument. At the time that the evidence was not preserved, the investigation into the shooting was four days old, and no suspect had been identified.[6] Thus, defendant was not a suspect, and his theory of self-defense did not yet

_____

[6] Based on our review of the record, the parties and the trial court appear to have operated under the assumption that the state's decision to discard the evidence occurred simultaneously with its discovery of the evidence and its decision to photograph the items. Thus, we also use that as the relevant point at which to analyze whether the evidence had an exculpatory nature that would have been apparent to the state.

exist. Accordingly, whether the items would have supported defendant's ultimate theory of the case—that he was acting in self-defense—has no immediate bearing on the analysis.[7]

As for defendant's claim that the evidence was materially exculpatory because no one was able to test the evidence, that is an argument relevant to the question of whether the evidence was potentially useful,[8] *see Youngblood*, 488 US at 57 (explaining that evidence is potentially useful if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"), but it does not demonstrate that the evidence had "an exculpatory value that was *apparent* before the evidence was destroyed," *Trombetta*, 467 US at 489 (emphasis added). Defendant argues that, because the evidence could not be tested, he lost access to evidence that, had it been available to be tested, might have produced exculpatory evidence. But any potential exculpatory value the items may have had was not apparent at the relevant time, because tests were necessary to ascertain whether the items could produce evidence that was exculpatory or not.

Next, we address defendant's third argument; to the extent that defendant's argument is that the evidence was so "inherently suspicious" that it clearly implicated the victim and his housemates in wrongdoing that led to the victim's death and, thus, obviously had exculpatory value for anyone (other than the victim and his housemates), including defendant, we disagree. The Due Process Clause does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 US at 58. Rather, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited

---

[7] As addressed in greater detail below, this case is unusual in the sense that the arguments are framed in the context of a failure to preserve when, in fact, the items were later rediscovered in the state's possession. That said, this claim of error addresses whether, based on the record as it existed at the time that defendant made his first motion to dismiss and in light of the trial court's factual finding that the evidence had been destroyed, the trial court correctly ruled that the state's destruction of the evidence did not violate defendant's right to due process. That the evidence was later discovered has no bearing on that question.

[8] We address the merits of defendant's alternative argument about potential usefulness in more detail below.

to evidence that might be expected to play a significant role in [a] suspect's defense." *Trombetta*, 467 US at 488.

It may be true, as defendant implies, that some items may be so inherently suspicious so as to immediately make their exculpatory nature known. For example, and as Baltzell acknowledged during his pretrial testimony, had officers found ammunition or a handgun, those items would likely have had immediately apparent exculpatory value in a case where officers knew that the victim had been shot. In contrast, here, the evidence at issue—a stocking cap and an empty box of fireworks—is not the sort of evidence that, in the fourth day of an investigation with no identified suspect, obviously relates to who killed the victim. As Baltzell testified, at the time he discarded the evidence, he "didn't see a connection between a firework going off and the homicide" and also did not connect the stocking cap with the eyes cut out to the shooting because "nobody said that somebody was wearing a ski mask." Thus, at the time the evidence was not preserved, the evidence was not so inherently suspicious as to have apparent exculpatory value. *See Faunce*, 251 Or App at 67-68 (rejecting the defendant's argument that the state should have preserved the pistol because it was exculpatory evidence by its "mere existence"; although we agreed that the gun was "relevant, additional evidence to corroborate [the] defendant's defense—that another *** individual *** shot [the victim]—we disagree[d] that [that] evidence alone [was] exculpatory" and because the "defendant was able to establish [at trial] that [the suspect] had a similar black powder pistol," "the mere admission of the pistol itself into evidence would have added little to his defense").

Finally, defendant contends that, because the stocking cap had "potential evidentiary value," it constitutes materially exculpatory evidence. Defendant's description of the evidence as having *potential* evidentiary value is speculation and is inconsistent with the notion that the nature of the evidence was such that the exculpatory value of it was apparent. *See United States v. Drake*, 543 F3d 1080, 1090 (9th Cir 2008) (explaining that mere speculation regarding the exculpatory value of evidence is not sufficient to establish that evidence is apparently exculpatory); *see also Bullock*

*v. Carver*, 297 F3d 1036, 1056 (10th Cir 2002) (stating that speculation about the "potential[] exculpatory nature" of evidence requires a showing of bad faith to prove a due process violation). Defendant's arguments, again, suggest that the evidence could—at most—constitute potentially useful evidence.

We therefore conclude that the trial court correctly concluded that, at the time the evidence was not preserved, the exculpatory nature of the evidence was not immediately apparent.

B. *The trial court's conclusions that the officers did not act in bad faith are binding on appeal.*

Defendant argues, in the alternative, that if the empty box of fireworks and the stocking cap with the eye holes cut out do not constitute materially exculpatory evidence, then they are potentially useful evidence, and he contends that the state acted in bad faith when it failed to preserve those items. We disagree on the latter point. The trial court found that the state did not act in bad faith when it decided to destroy the evidence, and the pretrial record supports that finding. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 US at 57 n *. Here, there is no evidence in the record to suggest that, at the time the evidence was destroyed, the officers knew that the evidence could be favorable to defendant or that the officers acted with "a conscious effort to suppress exculpatory evidence." *Jones v. McCaughtry*, 965 F2d 473, 478 (7th Cir 1992) (internal quotation marks omitted). Baltzell testified at the pretrial hearing that it was not apparent to him that these items could be exculpatory or that the items could be linked to the shooting, and the trial court credited that testimony. That finding is binding on appeal.

In sum, under the applicable law and given the trial court's factual finding, the trial court correctly denied defendant's pretrial motion to dismiss.

## V.   POST-TRIAL MOTION TO DISMISS

In defendant's first supplemental assignment of error, defendant challenges the trial court's denial of his post-trial motion to dismiss. As explained above in our discussion of defendant's motion for a new trial, the court concluded that the officers' actions were "negligent," but accepted Eubanks and Baltzell's testimony that they honestly believed that the items had been destroyed when they testified at defendant's trial. The court found that the officers did not lie or commit perjury at the prior motion to dismiss hearing, but, rather, were mistaken about what had happened to the evidence. The trial court also concluded that the evidence was not material. It therefore denied both defendant's motion for a new trial and motion to dismiss.

On appeal, defendant argues that the trial court erred in denying his post-trial motion to dismiss because the state violated his due process rights by failing to preserve the stocking cap and empty box of fireworks.[9] In support of his argument that the trial court erred in denying his post-trial motion to dismiss, defendant "relies on and incorporates the arguments [that he] advanced in [his] First Assignment of Error." Thus, defendant reprises his contention that the evidence was materially exculpatory and also reprises his argument in the alternative that the evidence was potentially useful and that the state acted in bad faith when it failed to preserve the items by misplacing them.

So framed, and in the absence of any arguments as to why the post-trial discovery of the evidence compels a different result, the fact that the evidence was rediscovered post-trial has no bearing on whether the evidence had

---

[9] Although the evidence at issue was found and was, in fact, preserved, defendant nevertheless argued at the post-trial hearing that the trial court should grant his motion to dismiss "based on *** the [s]tate's failure to properly preserve *** potentially exculpatory information." Defendant now presents that same argument to us on appeal.

At oral argument, defendant acknowledged that his second motion to dismiss mirrored his first—that is, that the question for the trial court, and now us, on the second motion is whether the state violated defendant's due process rights when it failed preserve evidence that defendant could have used during his trial. However, because the record before the trial court was different when it decided the post-trial motion from the record before it when it decided the pretrial motion, we address the two assignments of error separately.

an exculpatory value that would have been apparent to the state at the time the state failed to properly preserve the items. Thus, for the same reasons articulated in our discussion of defendant's first assignment of error, we conclude that the evidence at issue does not constitute materially exculpatory evidence.

Consistent with our analysis of defendant's first assignment of error, we also conclude that the post-trial record supports the trial court's finding that the state did not act in bad faith in its handling of the evidence. Although, as the trial court concluded, the state's conduct in misplacing the box of evidence reflects that the state acted negligently, the trial court concluded that the officers did not "intentionally lie[]" about what had happened to the evidence or "intentional[ly] obstruct[]" defendant's ability to present a defense. Furthermore, although defendant argues that "the police action was so clearly negligent that it amounted to bad faith," negligent conduct is not enough to constitute bad faith. *See Youngblood*, 488 US at 58 (explaining that there was no bad faith on the part of the police where the police's failure to preserve evidence could "at worst be described as negligent"). Thus, the record supports the trial court's finding that the state did not act in bad faith.

In sum, the state's failure to preserve evidence did not violate defendant's due process rights and the trial court correctly denied defendant's post-trial motion to dismiss.

## VI.   MOTION FOR MISTRIAL

In defendant's second assignment of error, defendant argues that the trial court erred when it denied his motion for mistrial after the state failed to disclose a conversation that a detective had with a witness that was favorable to defendant. We review the denial of a motion for a mistrial for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990). However, "[i]t is not legally permissible for a trial court to deny a new trial for a *Brady* violation if there is a reasonable probability that the suppressed evidence would have resulted in a different outcome * * * or, put another way, if the government's suppression undermines confidence in the outcome of the trial." *State v. Deloretto*, 221

Or App 309, 321, 189 P3d 1243 (2008), *rev den*, 346 Or 66 (2009) (internal quotation marks omitted). We affirm.

During trial, defendant's counsel was questioning Eubanks about what happened to the .380 caliber pistol that Haney claimed to have been wearing and using that night. The following exchange occurred:

> "[Defense Counsel]:   Are you telling me you spoke to * * * Haney after July, 2018, about the substantive question of where the .380 handgun—how the .380 handgun left the scene?
>
> "[Eubanks]:   Yes.
>
> "* * * * *
>
> "[Defense Counsel]:   And * * * Haney told you some information about that?
>
> "[Eubanks]:   He did.
>
> "[Defense Counsel]:    And did you reduce that to a police report?
>
> "[Eubanks]:   No, I did not.
>
> "[Defense Counsel]:   Did you discover that to the Defense?
>
> "[Eubanks]:   No, I did not."

Following that exchange, and outside of the jury's presence, defendant argued that Eubanks's failure to include that information in a report or produce that information to the defense amounted to a discovery violation and moved for a mistrial.

The trial court observed that it did not know what Haney had said to Eubanks. Eubanks then clarified, "[S]ome time just shortly before the trial * * * or during the process in serving [Haney,] * * * I asked him, you know, I'd still like to know what happened [to the gun], where it went, and [Haney] told me I don't want to get in trouble. I don't want to tell you."

The trial court denied defendant's motion for a mistrial. Although the trial court described the state's failure to provide that information to defendant as a discovery

violation, it concluded that it did not find that there was "any [prejudice] that would support a mistrial or a dismissal."

After the trial court denied defendant's motion, Eubanks testified in front of the jury that, when he served Haney with a subpoena, he asked Haney what had happened to the .380 caliber handgun that he used the night of the shooting. Eubanks further testified that Haney responded, "I don't want [to] get [in] any trouble, I'm not going to tell you."

Turning to the relevant legal standards, the failure to disclose "evidence favorable to an accused * * * violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 US at 87. However, where the prosecution fails to disclose evidence favorable to an accused, the dispositive question is "whether there was a reasonable probability that the undisclosed evidence would have resulted in an acquittal or, put slightly differently, whether in the absence of the undisclosed evidence the court nonetheless reached a verdict worthy of confidence." *State v. Bray*, 281 Or App 584, 600, 383 P3d 883 (2016), *aff'd*, 363 Or 226, 422 P3d 250 (2018) (quotation marks omitted).

Although the state's failure to disclose the conversation with Haney constitutes a discovery violation, we agree with the trial court that the state's violation is not of such magnitude that it "undermines confidence in the outcome of the trial." *Deloretto*, 221 Or App at 321 (internal quotation marks omitted). While it is evident that this information was not disclosed to defendant when it should have been, evidence of the state's conversation with Haney was presented to the jury through Eubanks's testimony. As a result, this is not a case in which a discovery violation actually resulted in any evidence being omitted from the trial. To the extent that defendant argues that he was prejudiced by this late disclosure because he was unable to cross-examine Haney regarding those statements, that argument also fails because defendant could have—but did not—recall Haney to question him about this new disclosure. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

## VII.   TAMPERING WITH A WITNESS ACQUITTAL

Finally, we turn to defendant's third assignment of error, in which he contends that the trial court erred when it entered a judgment stating that his charge for tampering with a witness was "[d]ismissed" rather than reflecting an acquittal. We agree.

During trial and at the end of the state's case, defendant moved for a judgment of acquittal for the charge of second-degree murder and for the charge of tampering with a witness. As to the charge of tampering with a witness, the state conceded that it had failed to present evidence that the witness was legally summoned to an official proceeding—an element of that offense under ORS 162.285. In response, the court stated that the tampering with a witness charge was "dismissed" and later entered a judgment stating that "Count # 2, Tampering with a Witness is Dismissed."

On appeal, defendant argues that, because he moved for a judgment of acquittal at the end of the state's case and because the state conceded and the court found that the evidence would not support a verdict against defendant, the court was obligated to enter an acquittal. The state contends that defendant's argument is not preserved because defendant did not object when the trial court stated that the tampering with a witness charge was "dismissed" and, alternatively, that the judgment is correct.

We begin with preservation. Defendant's claim of error falls into one of the narrow circumstances in which the rules of preservation do not apply—namely, a situation in which the nature of the problem was not apparent until after the judgment was entered. *See Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008) ("In some circumstances, the preservation requirement gives way entirely, as when a party has no practical ability to raise an issue."); *State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 182, 205 P3d 36 (2009) (the appellant did not need to preserve an issue concerning the judgment's lack of statutorily required findings because she had no practical ability to raise the issue until after the court entered the judgment).

Here, in ruling on defendant's motion, the trial court stated "Count 2 *** is dismissed. That—that one's out." It was reasonable for defendant to interpret the court's response as an indication that his motion had been granted as he had requested. Framed a slightly different way, it was not evident that the trial court was intentionally making a distinction between "dismissal" and "acquittal" and choosing one over another. Because the error would not have been apparent to defendant until after the judgment was entered, defendant had no practical ability to raise the issue until after the court entered the judgment. Under those circumstances, preservation was not required.

As to the merits, ORS 136.445 governs motions for judgment of acquittal and the standard for granting that motion: "In any criminal action the defendant may, after close of the state's evidence or of all the evidence, move the court for a judgment of acquittal. The court shall grant the motion if the evidence introduced theretofore is such as would not support a verdict against the defendant."

Here, as the state conceded below, no evidence supported a conviction for witness tampering. Because the evidence introduced at trial did not support a verdict against the defendant on the charge of tampering with a witness, ORS 136.445 required the court to enter a judgment of acquittal. Therefore, the trial court erred when it entered a judgment of dismissal instead of an acquittal.

Judgment of dismissal on count of tampering with a witness reversed and remanded; otherwise affirmed.